## Richmond

FORREST PERRY HEACOCK

V.

COMMONWEALTH OF VIRGINIA

Record No. 822002.

November 30, 1984.

Present: All the Justices.

*William P. Robinson, Jr. (Murray J. Janus; Robinson, Eichler, Zaleski & Mason; Bremner, Baber & Janus*, on brief), for appellant.

*James E. Kulp, Senior Assistant Attorney General (Gerald L. Baliles, Attorney General*, on brief), for appellee.

POFF, J., delivered the opinion of the Court.

The principal question in this appeal is whether one who feloniously distributes cocaine is guilty of murder of the second degree when the recipient dies of an overdose. We will also consider other issues raised by the assignments of error.

The evidence is without substantial conflict. Jeff Chalkley and Audi Chaplin were hosts at a "drug party" held in their home during the early morning hours of August 16, 1981. Forrest Perry Heacock supplied a quantity of what was described as "[v]ery high quality cocaine". Heacock took the cocaine from a "baggie," laid it in separate lines on a table, and invited those present to help themselves. For a time, the group sat around the room listening to music, "snorting" cocaine, and drinking beer. Chaplin and Sharon Dryden left the party to buy more beer and, on their way to the store, stopped at the home of Karla Wilson in search of marijuana. Wilson said that she had some "reefers," and they invited her to join the party on her way to work to "smoke some" and to "do some" cocaine.

After Chaplin and Dryden left Wilson's home, they paid a visit to Steve Fuller "looking for some needles" in order to "run cocaine." Fuller produced the needles and rode with them back to the party. Wilson arrived a short time later with her marijuana. The "pot" was placed in a "bong," and the group began "hitting bong" and "running" cocaine with Fuller's needles.

Sometime later Heacock, Dryden, Chaplin, and Wilson went upstairs together. According to Dryden, she and Wilson "were sitting on the end of the bed" while Heacock and Chaplin "were putting [cocaine] in the spoon so that we could run some." Heacock watched as Wilson held Dryden's arm and Chaplin injected the mixture into a vein in Dryden's hand. Dryden suffered a sud-

den paralyzing seizure and fell back on the bed. When she revived, she went downstairs and "was sitting there for a while" when she heard "something thumping" upstairs. Fuller, who had remained downstairs, heard the same noise which he described as "like somebody kicking." Fuller testified that "maybe five minutes after that, [Heacock] came flying down the stairs and asked if I knew about what to do if somebody had gotten an overdose". Fuller and Dryden went upstairs where they found Wilson lying face-down under a blanket on the floor. Although Wilson "only had fifty cc's", she was experiencing periodic convulsions with "her head . . . hitting the floor." She "wasn't breathing too well", and when she failed to respond to "mouth to mouth recitation [sic]", Chaplin went to the telephone and called the rescue squad. Wilson died three days later of "acute intravenous cocainism".

Fuller testified that when Heacock learned about the telephone call he exclaimed, "[I]f I'm here when the rescue squad comes, the police are going to try and get me." The next day, Heacock gave Fuller some cocaine and told him to sell it. Sometime prior to the trial, Heacock talked with Fuller about his testimony. Fuller testified that "he was trying to get me to go along with a story" to the effect that "it was just the two girls upstairs, and that he was never up there, and that the cocaine had come from somebody else other than him."

Bruce Collie, another guest at the party, testified that he and Heacock decided to leave before the rescue squad arrived. They "grabbed a couple bongs" and "gathered up some stuff, and we left." They went first to Heacock's home where Heacock "gathered up some stuff", including "some scales", and "put it in a bag", and then the two "[j]umped on the dirt bike, and rode back in the woods" where Heacock "buried" the bag. Heacock told Collie: "Just play it cool. Don't tell anybody what happened. Said if it come down to anything, we could probably blame it on Sharon [Dryden]."

Heacock and Chaplin did not testify at trial, and the record does not show who administered the fatal injection.

The trial court, sitting without a jury, convicted Heacock of conspiring to distribute cocaine, possession and distribution of cocaine, and murder of the second degree. Heacock appeals from three judgments imposing sentences aggregating 80 years in the penitentiary, with 40 years suspended.

We consider first the appeal from the murder conviction. The General Assembly has created two classes of felony-murder. "Murder . . . in the commission of, or attempt to commit, arson, rape, forcible sodomy, inanimate object sexual penetration, robbery, burglary or abduction . . . is murder of the first degree . . . ." Code § 18.2-32. "The killing of one accidentally, contrary to the intention of the parties, while in the prosecution of some felonious act other than those specified in §§ 18.2-31 [capital murder] and 18.2-32, is murder of the second degree . . . ." Code § 18.2-33.

While § 18.2-32 contemplates a "killing with malice", the malice intrinsic in the commission of one of the predicate felonies "provides the malice prerequisite to a finding that the homicide was murder." *Wooden* v. *Commonwealth*, 222 Va. 758, 762, 284 S.E.2d 811, 814 (1981). The same imputation of malice is implicit in § 18.2-33 which contemplates an accidental killing; the commission of *any* felonious act (other than those expressly excepted) during the prosecution of which a death occurs supplies the malice which raises the incidental homicide to the level of second-degree murder. This statute codifies ancient common law. *See Whiteford* v. *Commonwealth*, 27 Va. (6 Rand.) 721 (1828).

The indictment charged Heacock with a violation of § 18.2-33 and defined the underlying "felonious act" as "Distribution of cocaine, a Schedule II controlled substance". The evidence shows that the cocaine was supplied by Heacock and that Wilson received an intravenous injection of that substance. The defendant does not challenge these facts. Instead, he argues that the evidence fails to show that he administered the fatal injection. This argument overlooks Dryden's testimony that Heacock and Chaplin jointly prepared the narcotic mixture in a spoon, the essential first step in the process of administration by syringe. Hence, it is immaterial that Chaplin may have inserted the needle or that Wilson may have injected herself. The defendant was a principal in the second degree and, as such, criminally responsible for the consequences of his conduct "as if a principal in the first degree". Code § 18.2-18.

Yet, Heacock maintains that he is not criminally responsible for Wilson's death because, he says, that was not a foreseeable consequence of the criminal conduct charged in the indictment. "[A]pplication of the [felony-murder] rule to felonies not foreseeably dangerous," he reasons, "would be unsound analyti-

cally, because there is no logical basis for imputing malice from the intent to commit a felony not dangerous to human life." But nothing in § 18.2-33 limits its scope to such felonies; rather, that statute encompasses all felonious acts except capital murder and the several crimes particularly named in § 18.2-32.

Even if we were disposed to interpret the statutory language to conform to the defendant's view, which we are not, the evidence defeats the premise of his analysis. Heacock knew, or should have known, that injection of the narcotic he supplied and helped to administer to Wilson was inherently dangerous to human life. Only minutes before, he had seen Dryden suffer a violent reaction to an injection of the same substance. At trial, defense counsel asked Dr. William Masselo, a forensic pathologist experienced in the diagnosis of cases of drug overdose, "how much cocaine would it take to throw somebody into cardiac arrest intravenously". Dr. Masselo replied, "Any amount could, in fact, do this to anyone." In determining how to classify a controlled substance, the State Board of Pharmacy is required to consider the "risk to the public health." Code § 54-524.84:1(a)(6). Cocaine is classified as a Schedule II controlled substance, § 54-524.84:6 (b)(4), because the Board has found that it "has high potential for abuse" which "may lead to severe psychic or physical dependence", § 54-524.84:5. And the General Assembly has recognized the human dangers associated with the unlawful distribution of cocaine. Conviction of the first offense carries a penalty of "not less than five nor more than forty years" and a fine of "not more than $25,000" and, upon a subsequent conviction, the accused may be "sentenced to imprisonment for life". Code § 18.2-248(a). Accordingly, we hold, as a matter of law, that the unlawful distribution of cocaine is conduct potentially dangerous to human life.

The defendant urges us to hold that the felony-murder rule does not apply unless the underlying felony is shown to be the proximate cause of the death. It is not sufficient, he believes, that the death occurred as an incident to the commission of the felonious act. In *Doane* v. *Commonwealth*, 218 Va. 500, 502-03, 237 S.E.2d 797, 798-99 (1977), we reserved the question whether the application of the rule requires a "showing . . . of causal relationship, or whether a showing of mere nexus will suffice". We do not decide that question here, because it is foreclosed by evidence which we consider conclusive. The underlying felony was distribution of cocaine, a drug the defendant should have known was in-

herently dangerous to human life; Wilson ingested that drug and, as we have said, it is immaterial who made the injection; Wilson died of "acute intravenous cocainism"; thus, cause and effect were proximately interrelated.

> [W]hen the homicide is within the *res gestae* of the initial felony and is an emanation thereof, it is committed in the perpetration of that felony. Thus, the felony-murder statute applies where the initial felony and the homicide were parts of one continuous transaction, and were closely related in point of time, place and causal connection . . . .

*Haskell et al.* v. *Commonwealth*, 218 Va. 1033, 1041, 243 S.E.2d 477, 482 (1978).

Next, the defendant contends that the felony-murder rule does not apply in this case because the decedent "was a co-felon in the sense that she was present at a 'drug party' ". Apparently, Heacock relies upon our decision in *Wooden* v. *Commonwealth, supra*, where we held that "a criminal participant in a felony may not be convicted of the felony-murder of a co-felon killed by the victim of the initial felony." 222 Va. at 765, 284 S.E.2d at 816. We adhere to that holding, but it is inapposite here. Wilson was not a co-felon killed by the victim of the drug-distribution felony; she was the victim of the crime.

Finding no merit in the first assignment of error, we hold that where, as here, death results from ingestion of a controlled substance, classified in law as dangerous to human life, the homicide constitutes murder of the second degree within the intendment of § 18.2-33 if that substance had been distributed to the decedent in violation of the felony statutes of this Commonwealth. *See generally*, Annot., 32 A.L.R.3d 589 (1970).

Heacock also assigns error to the court's failure to find that the distribution involved in this case was merely an "accommodation" as that term is used in Code § 18.2-248(a).[1] The pen-

---

[1] Code § 18.2-248(a) provides in part:

If [the accused] proves that he *gave*, distributed or possessed with intent to *give* or distribute a controlled substance classified in Schedule I or II only as an accommodation to another individual who is not an inmate in a penal institution . . . or in the custody of an employee thereof, and *not with intent to profit thereby from any consideration received or expected* nor to induce the recipient or intended recipient . . . to use or become addicted to or dependent upon such controlled substance, he shall be guilty of a Class 5 felony. [Emphasis added.]

alty imposed for his distribution conviction was imprisonment for 40 years, with 20 years suspended. He contends that the penalty should be no greater than imprisonment for 10 years, the maximum prescribed for a Class 5 felony. Code § 18.2-10.

Construing Code §§ 18.2-248(a) and -263[2] together, we have held that a defendant who invokes an accommodation defense has the burden of proving the elements of that defense by a preponderance of the evidence. *Stillwell* v. *Commonwealth*, 219 Va. 214, 247 S.E.2d 360 (1978). And in construing § 18.2-248(a) as a whole, we have observed that the General Assembly intended the reduced penalty to apply when the unlawful distribution was made "not by a dealer in drugs, a pusher or one who was normally engaged in the drug traffic, but by an individual citizen who was motivated by a desire to accommodate a friend." *Id.* at 219, 247 S.E.2d at 364.

Heacock argues that he supplied the cocaine free of charge and that his only purpose was to accommodate a group of people assembled at a party. While there is some evidence to this effect, other evidence tends to show that Heacock was a "dealer in drugs" whose motivation in supplying the cocaine was more than simply a "desire to accommodate a friend." The drug Heacock supplied was "[v]ery high quality cocaine", and the quantity was sufficient to distribute among a number of users, some of whom ingested the substance several times. The paraphernalia Heacock took as he fled from the police and the scales and "stuff" he retrieved from his home and buried in the woods were indicia of commercial traffic in drugs. And the day following the party, Heacock delivered a quantity of cocaine he had acquired from some source to Fuller with instructions to sell it.

Drug dealers must cultivate and maintain a familiar clientele of habitual drug users, and the users can satisfy their habit only when they know a dealer they can trust to supply a quality product promptly upon demand. A drug party, catered gratis by a dealer, is a typical public-relations tool designed to promote good

---

[2] § **18.2-263. Unnecessary to negative exception, etc.; burden of proof of exception, etc.** — In any complaint, information, or indictment, and in any action or proceeding brought for the enforcement of any provision of this article or of The Drug Control Act (§ 54-524.1 et seq.), it shall not be necessary to negative any exception, excuse, proviso, or exemption contained in this article or in The Drug Control Act, and the burden of proof of any such exception, excuse, proviso, or exemption shall be upon the defendant.

will, strengthen mutual confidence and interdependence, and enhance the dealer's business prospects.

A person convicted of distributing a controlled substance is not entitled to the reduced penalty afforded by § 18.2-248(a) if the distribution was made "with intent to profit thereby". The "profit" contemplated by the statute is "any consideration received or expected". We believe the evidence and the reasonable inferences it raises support a finding that Heacock was a dealer in drugs and that he distributed samples of his high-quality merchandise to the several guests at the party with the expectation of promoting profits from future sales. Consequently, we will affirm the conviction for felonious distribution and uphold the sentence imposed thereon.

Finally, the defendant challenges the sufficiency of the evidence to support his conviction of conspiracy for which he was sentenced to imprisonment for 20 years with 10 years suspended. The Attorney General believes that the circumstantial evidence was sufficient. We disagree.

"Conspiracy is defined as 'an agreement between two or more persons by some concerted action to commit an offense.'" *Wright v. Commonwealth*, 224 Va. 502, 505, 297 S.E.2d 711, 713 (1982) (quoting *Falden v. Commonwealth*, 167 Va. 542, 544, 189 S.E. 326, 327 (1937)). "There can be no conspiracy without an agreement . . . and the Commonwealth must prove beyond a reasonable doubt that an agreement existed." *Floyd v. Commonwealth*, 219 Va. 575, 580, 249 S.E.2d 171, 174 (1978) (citations omitted).

The indictment charged Heacock with conspiring with guests at the party to commit the offense of distribution of cocaine. The distribution offense was committed, but there is nothing to show that it was the product of "an agreement between two or more persons" to act in concert. Heacock was the only source of the cocaine and the sole distributor. The distributees possessed and used the controlled substance, but, so far as the record discloses, none was a party to an agreement to commit the offense Heacock committed.

Upholding this assignment of error, we will reverse the judgment convicting him of conspiracy and enter final judgment in his

favor. The judgments convicting him of felonious distribution and murder of the second degree will be affirmed.

*Affirmed in part,*
*reversed in part,*
*and final judgment.*