COURT OF APPEALS OF VIRGINIA

Present: Judges Benton, Bray and Senior Judge Overton
Argued at Norfolk, Virginia


RODERICK KIM RICKS

MEMORANDUM OPINION[*] BY
v.     Record No. 0432-98-1     JUDGE RICHARD S. BRAY
APRIL 13, 1999
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF SOUTHAMPTON COUNTY
E. Everett Bagnell, Judge

Damian P. Dwyer (Carter & Dwyer, P.C., on
brief), for appellant.

Richard B. Campbell, Assistant Attorney
General (Mark L. Earley, Attorney General, on
brief), for appellee.


Roderick Kim Ricks (defendant) was convicted in a bench

trial on four counts of distributing cocaine, violations of Code

§ 18.2-248(A). On appeal, defendant complains that the trial

court erroneously admitted into evidence expert opinion on a

matter of common knowledge and incorrectly ruled that the

offenses were not accommodation distributions. Finding no

error, we affirm the convictions.

The parties are fully conversant with the record, and this

memorandum opinion recites only those facts necessary to a

disposition of the appeal.

---

[*]Pursuant to Code § 17.1-413, recodifying Code § 17-116.010,
this opinion is not designated for publication.

Under familiar principles of appellate review, we examine the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom.  See Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987).  "An appellate court must discard all evidence of the accused which conflicts with that of the Commonwealth . . . ."  Lea v. Commonwealth, 16 Va. App. 300, 303, 429 S.E.2d 477, 479 (1993).  The credibility of a witness, the weight accorded the testimony, and the inferences to be drawn from proven facts are matters solely for the fact finder's determination.  See Long v. Commonwealth, 8 Va. App. 194, 199, 379 S.E.2d 473, 476 (1989).  The judgment of a trial court, sitting without a jury, will be disturbed only if plainly wrong or without evidence to support it.  See Code § 8.01-680.

I.

Assigned to make undercover drug "buys" for the Franklin Police Department, Linda Powell positioned herself outside the "C section" of the Dorchester Square Apartments (Dorchester) in the City of Franklin.  Defendant soon "pulled up," and Powell approached his vehicle, inquiring if "he [knew] where any dope was."[1]  When defendant responded that he would "take her" to

---

[1]Powell testified that she "[had] met [defendant] . . . years ago," but "didn't know him personally."  Defendant was acquainted with Powell's brother, then married to defendant's cousin, Daphine Holland, also a police informer.

"Calvin [Reid],"[2] Powell entered the car, and defendant drove several blocks, locating Reid at a "parking lot." Defendant spoke with Reid, purchased two "twenty-cent rocks" of cocaine from him, using funds provided by Powell, and "handed [her] the dope."

Later that evening, Powell returned to Dorchester, simply "stood outside," and defendant "came by, . . . stopped," and asked, "did [she] need some." Powell answered, "damn right," again entered defendant's car and was driven to Reid, then at a nearby "phone booth." Upon seeing Reid, defendant stopped the car, approached him, and purchased "a block, fifty" of cocaine with $50 supplied by Powell. Defendant passed the drugs to Powell on his return to the car.

The following night, Powell was once again at Dorchester to complete a "deal" she "had set up" with defendant the preceding day. When she saw defendant "standing outside," she approached and "told him [she] want[ed] some weight." Defendant joined Powell in a vehicle driven by Daphine Holland, and he directed her to an address on Bank Street. Powell gave defendant $50 which he exchanged with Reid for three "twenties[,] three rocks" of cocaine. Upon receipt of the drugs from defendant, Powell protested, "He's going to have to look out for me next time.

---

[2]Reid, a reputed drug dealer, was the focus of a police investigation.

This s___ is light.  Did he look out for you?," and defendant responded, "I'll get mine."

Several hours later, Powell returned to the usual location at Dorchester, and defendant "pulled up," declaring that he "just saw Reid."  Powell asked defendant if Reid had "an eight ball," and he replied, "naw, he got some fifties."  Powell again traveled in defendant's car to locate Reid, paid defendant $50, and he returned with cocaine for her.

At trial, Franklin Detective David Welch, "based on [his] experience working narcotics," interpreted defendant's statement, "I'll get mine," to mean that Reid would "take care of" defendant in return for his assistance in the cocaine sales to Powell.  Defendant's counsel objected, arguing, "That's plain English.  I mean, 'I'll get mine' is just a simple . . . ."  The court overruled the objection, reasoning that the statement "doesn't mean a thing to certain people who are not familiar with the drug trade."

Defendant also testified, acknowledging that he was a cocaine "user" at the time of the offenses and sometimes purchased drugs from Reid, "one of the biggest drug dealers in Franklin."  Defendant did not deny his role in the subject offenses, which he characterized as "buys."  However, he insisted that he acted "as a favor" to his cousin, Daphine Holland, after she "came by and said [Powell] was in town, . . .

want [sic] to get high."  He denied any expectation of gain or favor from the transactions.  Defendant explained that his comment, "I'll get mine," referenced his plan to later purchase a greater quantity of drugs for himself at a better bargain, "spend . . . $50.00 and get $50.00 worth."

## II.

Defendant first complains on appeal that the court erroneously countenanced the detective as an "expert witness"[3] and permitted him to construe the phrase "I'll get mine," words of "standard English usage."  However, our review of the record discloses that it was defendant's questioning of Welch that first placed this evidence in issue.  During his examination of Welch, the following exchange occurred:

> Q:  Are you aware of any consideration that [defendant] got for taking these folks to Mr. Reid?
>
> \*       \*       \*       \*       \*       \*       \*
>
> A:  On these particular cases the only evidence I would have from that has been the statement I heard him say over the mike as to where he would get his. . . .
> Q: You don't know what he meant by that, do you?
> A:  No.
> Q:  You just have an interpretation.

---

[3]Defendant concedes that he did not properly preserve an objection to the witness' qualification as an expert and, therefore, Rule 5A:18 precludes our consideration of that issue. Rule 5A:18; see Snurkowski v. Commonwealth, 2 Va. App. 532, 536, 348 S.E.2d 1, 3 (1986).

        A:  But, I mean, I know the street lingo and
            I know what I would interpret it to be.

        Thus, defendant opened the door of inquiry into Welch's knowledge of "any consideration" flowing from Reid to defendant as a result of the Powell transactions.  "Subject to such reasonable limitations as the trial court may impose, [the Commonwealth then had] an absolute right to [examine the] witness on a matter relevant to the case, which [defendant] put in issue by . . . examination of the witness."  Washington v. Commonwealth, 228 Va. 535, 549, 323 S.E.2d 577, 587 (1984) (citing Basham v. Terry, 199 Va. 817, 824, 102 S.E.2d 285, 290 (1958)), cert. denied, 471 U.S. 1111 (1985); see also Lockhart v. Commonwealth, 251 Va. 184, 466 S.E.2d 740 (1996).

        Defendant next contends that the court erred in failing to find the illicit transactions were merely "accommodations" contemplated by Code § 18.2-248(D).[4]  "[A] defendant who invokes an accommodation defense has the burden of proving the elements of that defense by a preponderance of the evidence."  Heacock v. Commonwealth, 228 Va. 397, 406, 323 S.E.2d 90, 95 (1984); see Hudspith v. Commonwealth, 17 Va. App. 136, 137-38, 435 S.E.2d

---

        [4]"[T]he General Assembly [prescribed a] reduced penalty . . . when the unlawful distribution was made 'not by a dealer in drugs, a pusher or one who was normally engaged in the drug traffic, but by an individual citizen who was motivated by a desire to accommodate a friend.'"  Heacock v. Commonwealth, 228 Va. 397, 406, 323 S.E.2d 90, 95 (1984) (quoting Stillwell v. Commonwealth, 219 Va. 214, 219, 247 S.E.2d 360, 364 (1978)).

-

588, 589 (1993).  Clearly, the defense is not available if the offender distributed drugs "with intent to profit thereby from any consideration received or expected."  Code § 18.2-248(D); see Heacock, 228 Va. at 407, 323 S.E.2d at 96.

Welch's interpretation of defendant's statement, "I'll get mine," defendant's ready availability and eagerness to procure drugs for Powell, his ongoing familiarity with Reid's whereabouts and inventory, and his detached relationship with Powell, together with other evidence, clearly negated the accommodation defense, notwithstanding defendant's testimony to the contrary.  See Marable v. Commonwealth, 27 Va. App. 505, 509-10, 500 S.E.2d 233, 235 (1998) ("In its role of judging witness credibility, the fact-finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that [he] is lying to conceal his guilt.").

Accordingly, the convictions are sufficiently supported by the evidence, and we affirm the trial court.

Affirmed.

Benton, J., dissenting.

An accommodation distribution as proscribed by Code § 18.2-248(D) is "a sale or distribution of a drug . . . made, not by a dealer in drugs, . . . but by an individual citizen who was motivated by a desire to accommodate a friend, without any intent to profit or to induce or to encourage the use of drugs." Stillwell v. Commonwealth, 219 Va. 214, 219, 247 S.E.2d 360, 364 (1978). "[T]he General Assembly intended [a] reduced penalty to apply when the unlawful distribution was made [as an accommodation]." Heacock v. Commonwealth, 228 Va. 397, 406, 323 S.E.2d 90, 95 (1984). I believe the evidence proved by a preponderance, see id., that Roderick Kim Ricks, the defendant, only made accommodation distributions to the police informant.

The evidence proved that the informant's brother had been convicted of the felony of distributing cocaine and that the informant asked to "work for [the] Franklin Police [to obtain favorable] . . . consideration for [the informant's] brother's sentencing." The police agreed to work with the informant and made arrangements for the informant to purchase cocaine under their control.

The evidence also proved the informant had substantial connections to the defendant. The informant's brother was married to the defendant's cousin. The informant testified that she knew who the defendant was and had first met him years ago.

The informant's brother and the defendant were friends.  The defendant's cousin, the sister-in-law of the informant, was assisting the informant and the police.

The informant testified that she did not have a license to drive.  Therefore, the defendant's cousin drove the informant in the cousin's truck on each occasion when the informant met the police to be wired and to receive money to buy cocaine.  The defendant's cousin then drove the informant to the defendant's cousin's apartment.

The informant testified that when she went to make the first purchase of cocaine for the police, the defendant arrived outside his cousin's apartment and the defendant "got in [his cousin's] truck" with the informant.  The Commonwealth's evidence is silent concerning who arranged the meeting on that occasion.  The defendant testified, however, that his cousin told him that the informant wanted to buy cocaine and asked his assistance.  The evidence is undisputed that the informant initiated the cocaine buy when she "asked [the defendant] did he know where any dope was?"

The defendant drove the informant to a parking lot to meet Calvin Reid, the target of the investigation.  The informant gave $40 to the defendant before he exited the car to talk to Reid.  After the defendant spoke with Reid, Reid walked to the car with the defendant and told the defendant he did not know

the informant.  The defendant introduced her as "Reggie's sister," i.e., the sister of the man for whom the informant was cooperating with the police to obtain favorable treatment.  The defendant gave the cocaine ("two twenty-cent pieces") to the informant and drove her to his cousin's apartment.  The informant told the defendant she would want more cocaine later.  The defendant's cousin then drove the informant to meet the police.

After the informant delivered the cocaine to the police, the defendant's cousin drove the informant back to the cousin's apartment building.  The informant stood outside the building until the defendant arrived.  When the defendant asked, "did [she] need some," she responded "you damn right."  Again she gave the defendant $50.  The defendant drove her to a car wash, spoke to Reid, returned to the car, and gave cocaine (one rock described "to [be] a block, fifty") to the informant.  When the defendant returned her to his cousin's apartment, the informant told the defendant she wanted to buy more cocaine the next day.  The defendant's cousin again drove the informant to deliver the cocaine to the police.

The next day, the defendant's cousin drove the informant to meet with the police.  The police gave the informant $210.  When the defendant's cousin drove the informant to the defendant's cousin's apartment, the informant spoke to the defendant outside

the apartment and told the defendant she "want[ed] some weight, not twenties." The defendant left, returned later, and drove her to Reid. She gave the defendant $50, and he returned to the car with "Three twenties. Three rocks. Three twenty-cent rocks." After the informant delivered the cocaine to the police, the police gave her $150 and she returned with the defendant's cousin to the apartment complex. The informant again met with the defendant, who told her that Reid did not have an "eight ball" but had "some fifties." The informant went with the defendant to locate Reid. The defendant spoke to Reid, and purchased for the informant "a piece" of cocaine for $50.

I believe this evidence proves an accommodation by a preponderance of the evidence. The detective who sent the informant to buy cocaine targeted the investigation to arrest Reid. Although the detective knew the defendant was a known cocaine addict, the detective had no prior information that the defendant sold drugs. The detective testified that he knew the defendant was buying his cocaine from Reid. The evidence clearly proved that the informant initiated the first transaction by asking the defendant's assistance in getting cocaine for her. On each occasion when she left him after making a purchase, she told him that she wanted more cocaine.

The defendant was not helping a stranger. He was assisting his friend's sister, the informant, to purchase cocaine. The

defendant's cousin, who was the sister-in-law of the informant, facilitated the arrangements. Indeed, the informant testified that during the time she was making these purchases, she spoke with the defendant on the telephone when he was in his cousin's apartment. Furthermore, I disagree that the evidence proved the defendant profited from the informant's purchases. The defendant assisted the informant on several occasions and never asked the informant for payment for taking her to Reid to buy cocaine. The informant also testified that she did not pay him either in money or cocaine for his services. The informant further testified that she did not know of any benefit that the defendant received from Reid, the seller.

The evidence proved that the informant told the defendant on several occasions that she wanted "some weight." After the first purchase she said to the defendant "This is all he had . . . I'm going to need some more later." The defendant told the informant he would help her get what she needed. On another occasion the informant told the defendant, "this won't last no time." The defendant laughed and said he would "be around" if she needed to purchase more.

The record clearly establishes that on the occasion when the informant had $210 to buy cocaine, she expressed her dissatisfaction with the quantity she received. When the defendant said, "All [Reid] had was twenties," the informant

said, "He's going to have to look out for me next time.  This

. . . is light.  Did he look out for you?"  The defendant's

response, "I'll get mine," does not prove that the defendant

profited or expected profit.

The detective's testimony, that in "street lingo" the

response meant "that he'll get his" or "the person . . . he got

the drugs from will take care of him," is consistent with the

hypothesis that the defendant did not expect his own purchases

from Reid to be "light."  Indeed, the defendant's response to

the informant was made in the context of the informant believing

that Reid did not give her the proper "weight" that she paid

for.  Evidence of this is found in the detective's testimony.

Despite his testimony as to the general meaning of the phrase

when used on the street, the detective conceded that he did not

know what the defendant meant.  The detective monitored the

conversations and testified as following concerning the last

purchase the informant made:

> Soon as [the defendant] got back to the car
> [the informant] started yelling at him for
> taking so long and accusing him of skimming
> some off the top of what he brought back.
> Basically the informant says, "I was getting
> ready to leave your ass."
> [The defendant] says, "I won't long."
> The informant says, "This is some light
> shit, too.  Can't he do better than this?
> This is my damn money."
> [The defendant] says, "That's all he got."

> The informant said, "Damn, this ain't right. He gonna have to do better than this next time."

This evidence proved that the informant believed Reid was not giving her an appropriate amount of cocaine for her money. The defendant's response is consistent with the hypothesis that the defendant believed Reid would not give the defendant a "light" amount when the defendant made his purchases.

For these reasons, I would hold that the evidence proved by a preponderance an accommodation. Thus, I would reverse the convictions and remand for resentencing.