COURT OF APPEALS OF VIRGINIA

Present:  Judges Elder, Humphreys and Alston
Argued at Richmond, Virginia


JEFFREY SCOTT CARROWIANO

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 1884-08-2                      JUDGE ROSSIE D. ALSTON, JR.
                                                           DECEMBER 8, 2009
COMMONWEALTH OF VIRGINIA


                        FROM THE CIRCUIT COURT OF HENRICO COUNTY
                                    Burnett Miller, III, Judge

                Brian S. Foreman (Cary B. Bowen; Bowen, Champlin, Carr,
                Foreman & Rockecharlie, on brief), for appellant.

                Karen Misbach, Assistant Attorney General II (William C. Mims,
                Attorney General, on brief), for appellee.


        Jeffrey Scott Carrowiano (appellant) appeals his conviction for the second-degree felony

murder of Larry Wayne Smith (Smith), in violation of Code § 18.2-33.  On appeal, appellant

contends that the evidence was insufficient to sustain his conviction.  Appellant argues that the

causal connection between the predicate felony of distribution of a controlled substance and Smith's

death was broken by Smith's ingestion of Xanax, an act of which appellant was not aware.  For the

reasons that follow, we disagree with appellant, and affirm his conviction.

                                        BACKGROUND[1]

        On appeal, we view the evidence in the "light most favorable" to the Commonwealth.

Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786 (2003).  That principle compels

_____

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

        [1] As the parties are fully conversant with the record in this case, and because this
memorandum opinion carries no precedential value, we recite only those facts and incidents of
the proceedings as are necessary to the parties' understanding of this appeal.

us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." Parks v. Commonwealth, 221 Va. 492, 498, 270 S.E.2d 755, 759 (1980) (emphasis omitted). So viewed, the evidence was as follows.

Late in the afternoon of March 9, 2007, appellant visited Smith at Smith's home. Smith's sister-in-law saw appellant show Smith a "prescription bottle" with a "screw-on top that would be on a drink." Appellant poured some of the liquid into the cap and gave it to Smith, who drank the liquid. The liquid was methadone, a synthetic narcotic used to treat heroin or other opiate addictions and for the treatment of chronic pain. Appellant and Smith left Smith's home shortly thereafter.

Around 10:45 p.m. that evening, Smith and two friends, Tia and Tabatha, drove to appellant's house where they bought a "pill bottle" of liquid methadone from appellant. Smith, Tia, and Tabatha went to the bathroom, and Smith distributed the entirety of the bottle's contents among them. Smith drank two capfuls, Tia ingested one capful, and Tabatha ingested one half of a capful.

When the three friends left the bathroom, appellant asked if they consumed all of the methadone in the bottle. When they responded in the affirmative, appellant said, "[O]h my God, y'all are gonna f--king O.D." Appellant was worried because they did not dilute the methadone with water. Appellant told them to leave and walked the three friends out of the house. Outside, he showed them the prescription bottle that bore his name and informed them that they consumed two hundred and forty milligrams between the three of them.

Smith, Tabatha, and Tia returned to Smith's home around midnight, and Smith cooked them dinner. Smith also played video games with his son after returning home. Tia testified at trial that she did not recall seeing Smith take any other methadone that evening. Tia stated that she knew

Smith sometimes took pain medication and Xanax, but did not believe he was a regular user of methadone. Tabatha and Tia left the home around 1:00 a.m.

Natasha Smith, Smith's wife, awoke around 3:30 a.m. and saw Smith sleeping on the floor in front of the television, snoring loudly. When she got up at approximately 7:30 a.m., Smith was in the same position, not breathing. Natasha called 911, and Smith was pronounced dead by the paramedics who arrived at the home shortly thereafter.

Dr. Deborah Kay, the Assistant Chief Medical Examiner for the Commonwealth of Virginia, conducted an autopsy on Smith. She found methadone, alprazolam, and a small amount of hydrocodone in Smith's system and concluded that methadone and alprazolam poisoning caused Smith's death. Alprazolam is an anti-anxiety drug with the trade name Xanax. Dr. Kay testified that "in this particular case, the methadone by itself could be lethal, the alprazolam would not [be lethal]." She stated that she listed the combination of the drugs as the cause of death because both drugs were present, and some medical studies had concluded that the combination of the drugs could be deadly, even when similar amounts of the respective drugs in isolation would not be fatal.

Dr. Julia Pearson, a forensic toxicologist employed by the Department of Forensic Science, performed a toxicological examination of the evidence submitted in the instant case. Dr. Pearson stated methadone causes respiratory depression, by acting on the opiate receptors, suppressing the ability of the brain to recognize changes in oxygen levels and carbon dioxide levels. At trial, one of the investigating officers had described the condition of Smith's body upon arriving at the scene. He stated, "There was foam within the victim's mouth, a large amount of grayish foam." Dr. Pearson stated that the gray foam around Smith's mouth was fluid that built up in Smith's lungs and then exuded from his mouth as a result of methadone poisoning. Dr. Pearson testified that the symptoms of a methadone overdose consist of a deep sleep accompanied by heavy, loud snoring,

followed by death. She stated that death could occur somewhere between four to six hours after ingestion.

The Commonwealth questioned Dr. Pearson about the interaction between the alprazolam and methadone found in appellant's body. Dr. Pearson stated that both drugs act as central nervous system depressants. She was unable to determine whether or not the alprazolam had a significant interaction with the methadone, because the level of alprazolam in Smith's system was consistent with a high therapeutic dose of Xanax and in an amount that Dr. Pearson did not consider to be "subtantial."

Dr. Pearson opined that the methadone concentration of .25 milligrams per liter in Smith's blood was "well above therapeutic," and the concentration of methadone in his liver was "consistent with toxic lethal concentrations" of the drug. She did note that chronic methadone patients, those who receive the drug regularly as part of a treatment plan, receive higher doses of the drug, and may have concentrations of the medication approaching approximately 0.2 to 0.3 milligrams per liter, but "[n]ot much higher than that." Dr. Pearson testified that when drivers are arrested for driving under the influence of methadone, the concentration of methadone in their blood is typically "between . . . 0.05 and 0.1 [milligrams per liter]." The highest concentrations of methadone are typically around 0.2 milligrams per liter. Dr. Pearson added that she did not know Smith's tolerance to the drug, which could have been a variable in determining what concentration would prove toxic to him.

Dr. Pearson concluded,

> In my opinion, this surely is a lethal concentration of methadone, [which] contributed to the cause of death. What I don't know is whether the Xanax, in addition to that, also may have played a role in contributing to the cause of death. There's no doubt in my mind that methadone is the key factor here. . . . Without methadone, this individual would still be alive.

At the close of the Commonwealth's case, appellant moved to strike, arguing that because the evidence demonstrated that alprazolam may have played a role in Smith's death, the trial court was left to speculate whether the methadone alone would have been fatal. Appellant further argued that because the evidence did not show Smith's tolerance to the drug, the evidence did not prove that methadone caused Smith's death. The trial court overruled the motion to strike, noting that Dr. Kay testified that the "levels of . . . methadone in the blood and liver were toxic to the point of being lethal, and were actually the cause of death."

The appellant did not present any evidence, and renewed his motion to strike. The trial court overruled the motion and found appellant guilty of felony homicide. This appeal followed.

ANALYSIS

"When examining a challenge to the sufficiency of the evidence on appeal, 'the evidence and all reasonable inferences flowing therefrom must be viewed in the light most favorable to the prevailing party in the trial court.'" Crowder v. Commonwealth, 41 Va. App. 658, 660, 588 S.E.2d 384, 385 (2003) (quoting Hudson, 265 Va. at 514, 578 S.E.2d at 786). "The judgment of the trial court is presumed to be correct and will be reversed only upon a showing that it is plainly wrong or without evidence to support it." Viney v. Commonwealth, 269 Va. 296, 299, 609 S.E.2d 26, 28 (2005) (internal quotation marks and citations omitted). "The issue upon appellate review is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Maxwell v. Commonwealth, 275 Va. 437, 442, 657 S.E.2d 499, 502 (2008) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

Code § 18.2-33 defines felony homicide as the "killing of one accidentally, contrary to the intention of the parties, while in the prosecution of some felonious act" not already punishable as capital or first-degree murder. See also Heacock v. Commonwealth, 228 Va. 397,

403, 323 S.E.2d 90, 93 (1984). "While Code § 18.2-32[, the first-degree murder provision,] contemplates a 'killing with malice', the malice intrinsic in the commission of one of the predicate felonies 'provides the malice prerequisite to a finding that the homicide was murder.'" Heacock, 228 Va. at 403, 323 S.E.2d at 93 (quoting Wooden v. Commonwealth, 222 Va. 758, 762, 284 S.E.2d 811, 814 (1981)). Our Supreme Court has determined that the "commission of *any* felonious act (other than those expressly excepted [by Code § 18.2-33]) during the prosecution of which a death occurs supplies the malice which raises the incidental homicide to the level of second-degree murder." Id.

However, not every homicide that occurs during the commission of a felony constitutes felony murder. Davis v. Commonwealth, 12 Va. App. 408, 411, 404 S.E.2d 377, 379 (1991). "Otherwise, the felony-murder doctrine would make a felon absolutely liable for the accidental death of another person even though the death was a mere coincidence and not a consequence of the felony." Id. (citing King v. Commonwealth, 6 Va. App. 351, 355-56, 368 S.E.2d 704, 706-07 (1988)). Thus,

> "[w]hen the homicide is within the *res gestae* of the initial felony and is an emanation thereof, it is committed in the perpetration of that felony. Thus, the felony-murder statute applies where the initial felony and the homicide were parts of one continuous transaction, and were closely related in point of time, place, and causal connection . . . ."

Heacock, 228 Va. at 405, 323 S.E.2d at 95 (quoting Haskell v. Commonwealth, 218 Va. 1033, 1041, 243 S.E.2d 477, 482 (1978)).

The Supreme Court has previously held that "where . . . death results from ingestion of a controlled substance, classified in law as dangerous to human life, the homicide constitutes murder of the second degree within the intendment of Code § 18.2-33 if that substance had been distributed to the decedent in violation of the felony statutes of this Commonwealth." Id. See also Hickman v. Commonwealth, 11 Va. App. 369, 372, 398 S.E.2d 698, 699-700 (1990) (the

- 6 -

felony-murder doctrine applies when an individual "participate[s] as a principal in the first degree, jointly with [the victim], in the felonious act of knowingly and intentionally possessing cocaine and participates[s] as a principal in the second degree in [the victim's] possessory act of ingestion of cocaine," which results in the victim's death).

Appellant does not deny that methadone is a Schedule II controlled substance, whose possession and distribution is prohibited by Code § 18.2-248, or that appellant sold the drug to Smith. Instead, appellant argues that the evidence does not prove that the predicate felony, i.e., the sale of methadone to Smith, was sufficiently related to Smith's death. He argues that Smith's death was not close in either time or place to the felony. Further, he argues that the causal connection between the distribution of methadone and Smith's death was broken by Smith's ingestion of alprazolam, which appellant contends was an intervening, superseding act. Appellant contends that the felony and the homicide were not part of one continuous transaction as required by the *res gestae* doctrine, because Dr. Kay, the medical examiner, opined that the cause of death was methadone *and* alprazolam poisoning.

We do not find appellant's arguments persuasive. The science and medical testimony at trial was critical to the analysis and resolution of the legal issue in the matter. Regarding the temporal and geographic connection between the felony and Smith's death, we note that both medical experts testified that an overdose of methadone does not result in immediate death; rather, death occurs four to six hours after the ingestion of the drug. Smith's death at his home somewhere between four and a half to eight hours later does not relieve appellant of his culpability.

Turning to the crux of appellant's argument, we find that there was a causal connection between Smith's purchase and ingestion of methadone and his death, and we do not find that the alprazolam served as an intervening, superseding act that broke the causal connection. Appellant

argues that he was not aware that Smith had alprazolam in his system, and could not foresee that the alprazolam would have a negative reaction to the methadone consumed by Smith. The principles of causation, which are the same in both criminal and civil contexts, are well settled. See Gallimore v. Commonwealth, 246 Va. 441, 447, 436 S.E.2d 421, 425 (1993). As long as the underlying felony was a concurring, proximate cause of Smith's death, the felony-murder doctrine applies. Id. at 448, 436 S.E.2d at 426. Furthermore, "'[a]n intervening act which is reasonably foreseeable cannot be relied upon as breaking the chain of causal connection between an original act of negligence and subsequent injury.'" Id. at 447, 436 S.E.2d at 425 (quoting Delawder v. Commonwealth, 214 Va. 55, 58, 196 S.E.2d 913, 915 (1973)).

Appellant knew or should have known that the methadone he supplied Smith was inherently dangerous to human life. See Heacock, 228 Va. at 404-05, 323 S.E.2d at 94 (an individual should know a narcotic is potentially dangerous to human life when it is considered a Schedule II controlled substance and its distribution is criminalized). In fact, appellant's concern that Smith, Tabatha, and Tia may suffer an overdose of the drug, based on the amount they consumed, supports the factual conclusion that appellant knew or should have known that the distribution of methadone to Smith presented a "dangerous risk" to Smith's health. See Gallimore, 246 Va. at 448, 436 S.E.2d at 226. After appellant realized that Smith and his friends consumed all the methadone appellant gave them, appellant stated, "[O]h my God, y'all are gonna f--king O.D." Appellant's statement confirms that he knew the methadone he supplied was inherently dangerous to human life.

Further, the evidence is sufficient to show that the ingestion of the methadone purchased from appellant was causally connected to Smith's death. Both medical professionals stated that the concentration of methadone in appellant's system was a potentially lethal amount. Finally, the symptoms exhibited by Smith (the deep sleep, loud snoring, and foam present in his mouth)

are consistent with the symptoms of a methadone overdose as described in the testimony of

Dr. Pearson.  Thus, the presence of alprazolam in Smith's system does not break "the chains of

causal connection."  See Gallimore, 246 Va. at 447, 436 S.E.2d at 425.  Accordingly, we find

that the distribution of methadone to Smith was a concurring, proximate cause of Smith's death.

For the foregoing reasons, we affirm appellant's conviction.

Affirmed.