COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Beales, Malveaux and Causey
Argued at Salem, Virginia


ANTOINE JUWAN JEFFERSON

                                        MEMORANDUM OPINION* BY
v.        Record No. 1052-21-3          JUDGE DORIS HENDERSON CAUSEY
                                        DECEMBER 13, 2022

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
James J. Reynolds, Judge

M. Lee Smallwood, II, Deputy Public Defender, for appellant.

Matthew P. Dullaghan, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


On June 10, 2021, following a bench trial, the Circuit Court of the City of Danville

convicted appellant, Antoine Juwan Jefferson, of felony child abuse and neglect, in violation of

Code § 18.2-371.1, and felony murder, in violation of Code § 18.2-33, of his three-month-old

son, D.L.J.[1]  Jefferson appeals his convictions challenging the sufficiency of the

Commonwealth's evidence against him.  For the following reasons, we affirm the trial court's

judgment.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] We refer to the minor by his initials to protect his identity.

BACKGROUND[2]

During trial, Jefferson testified that on August 9, 2020, he dropped his wife, D.L.J.'s mother, off at work around 5:30 a.m., made D.L.J. a bottle between 11:00 a.m. and 11:30 a.m., and D.L.J. drank two to four ounces but would not drink anymore. D.L.J. stared at the television blankly. D.L.J. started "hysterically crying" and had trouble breathing between 1:00 p.m. and 1:30 p.m., and Jefferson's efforts to stop the crying were unsuccessful. Jefferson acknowledged that D.L.J.'s crying "was getting on [his] nerves." Jefferson stated that he was frustrated with D.L.J.'s crying; however, he would never take out his frustration on D.L.J. He stated that he thought that if he just shook D.L.J. "a little bit" he would stop crying. D.L.J. became limp and unresponsive. After Jefferson successfully attempted CPR, D.L.J. stopped crying and his breathing appeared to be normal, but he was still limp and unresponsive. Jefferson then put D.L.J. in a car seat and picked up his wife from work before taking D.L.J. to the emergency room.

Jefferson took D.L.J. to the Sovah Emergency Room in Danville. Upon arrival, D.L.J. was not breathing and unresponsive. Doctors were able to revive D.L.J. A CT scan revealed subdural bleeding between his brain and the right side of his skull and bleeding inside his brain. At the hospital, Jefferson told police that D.L.J. had rolled out of his baby bouncer on August 7, 2020. Police photographs at trial indicated the baby bouncer sat about seven to fourteen inches

---

[2] "In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party [below]." *Poole v. Commonwealth*, 73 Va. App. 357, 360 (2021) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)). This standard requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn [from that evidence]." *Bagley v. Commonwealth*, 73 Va. App. 1, 26 (2021) (alteration in original) (quoting *Cooper v. Commonwealth*, 54 Va. App. 558, 562 (2009)).

off Jefferson's carpeted living room floor. Jefferson told police that D.L.J. seemed different after the August 7 fall and was crying abnormally on August 9.

Jefferson reported to a detective that D.L.J. had been sick for several days since falling out of the baby bouncer. He reported that he sometimes shook D.L.J. back and forth to make him laugh. Jefferson stated that, on August 8, he held D.L.J. sideways and shook him back and forth trying to get D.L.J. to smile but realized that he might have shaken D.L.J. too hard based on the way D.L.J.'s head shifted side to side. Jefferson admitted that his wife and his mother told him previously not to shake D.L.J. because it could hurt D.L.J.'s brain.

D.L.J.'s heart stopped. Sovah medical staff restarted D.L.J.'s heart and transferred him to Duke Medical Center on August 10 where child abuse and neglect pediatrician Dr. Lindsay Terrell oversaw his care. Jefferson told Dr. Terrell that D.L.J. fell out of a baby bouncer on August 7, after which he was irritable and vomiting. Duke medical staff hooked D.L.J. to a ventilator and conducted various tests. A skeletal survey revealed that D.L.J. had three healing rib fractures on his right side, "a significant amount of retinal hemorrhages in the back of his eyes," and retinoschisis in his left eye, which occurs when blood builds up in the eyes until it "tears [the retinal] layers apart." Doctors determined that D.L.J. had no underlying genetic or hematology disorders that would have predisposed him to bleeding. Despite medical efforts, D.L.J. died on August 12, 2020.

After D.L.J.'s death, investigators interviewed Jefferson again and asked him to demonstrate using a doll to show how he shook D.L.J. Jefferson demonstrated by shaking the doll back and forth in a non-forceful manner. He told investigators that he stopped the shaking when D.L.J. appeared scared. The Commonwealth played several clips of this interview at trial. Jefferson admitted that he shook D.L.J. on August 9 about an hour prior to putting him in the car seat; he shook D.L.J. hard enough for D.L.J. to tense up, and his head snapped back "pretty

- 3 -

hard." Jefferson demonstrated how he shook D.L.J. that day by grabbing the doll's jaw area and shaking it back and forth.

Dr. Terrell opined at trial that D.L.J. was already clinically dead when he arrived at Sovah. She testified that retinoschisis "is something you see in significant trauma" such as "either head trauma or a motor vehicle collision, crush head injury, or high-altitude fall." She concluded that severe shaking caused D.L.J.'s injuries and not the fall from the baby bouncer. According to Dr. Terrell, "a responsible caregiver who's appropriately caring for a baby would know immediately if they had caused this degree of injury to a child. It would not be consistent with normal rocking, bouncing, [or] playing."

A medical examiner performed D.L.J.'s autopsy with assistance from a forensic anthropologist and a neuropathologist. The doctors found that D.L.J.'s brain was swollen with bleeding around the brain and the swelling restricted oxygenation, which killed nerve cells in the brain. D.L.J.'s brain had both fresh bleeding from a recent injury and blood clotting that indicated older injuries. He had epidural, intradural, and subdural hemorrhaging and severe lesions throughout the brain. The neuropathologist testified that these injuries were acute and inflicted between twelve hours to four days of D.L.J. being declared brain dead. She opined that the injuries would be caused by significant blunt force to the head. She stated that it "[w]ould be very unusual" to see such injuries caused from a short fall but that "it really depends on the situation, the position of the head and things like that." The forensic anthropologist testified that D.L.J.'s ribs had been fractured two to three weeks earlier and that "it took quite a large amount of force to fracture those ribs," more than the force from a fall from a baby bouncer.

Based on these findings, the medical examiner concluded that "[a] considerable amount of force would be required to cause" D.L.J.'s injuries and stated that she "would not be surprised to see th[o]se injuries in something like a car crash scenario." She denied that a fall from a baby

bouncer could have caused D.L.J.'s injuries. According to the medical examiner, the fatal injury was inflicted "around the time that [D.L.J.] was taken to the hospital and found unresponsive" and the effects would be evident "pretty immediately . . . right after the incident happened." D.L.J.'s injury would not be instantly fatal. The medical examiner recorded D.L.J.'s death as a homicide, specifically "[b]lunt force injuries of head in the setting of battered child syndrome."

The trial court denied Jefferson's motion to strike at the close of the Commonwealth's case. Thereafter, Jefferson testified in his own defense. When his counsel asked if Jefferson shook D.L.J. that day, Jefferson responded, "not viciously." Jefferson asserted that he "didn't shake him as hard as anybody thought." When asked what else might have caused D.L.J.'s injuries, he testified that D.L.J. had fallen off a couch at his godmother's house about two months before.

Jefferson argued that the Commonwealth failed to prove that he had abused D.L.J. and the Commonwealth failed to show a time, place, or causal connection between the alleged abuse and D.L.J.'s death sufficient to find him guilty of felony murder. The trial court found Jefferson guilty of child abuse and neglect based on a willful act but not an omission and found him guilty of felony murder. The trial court sentenced Jefferson to fifty years' imprisonment with twenty-five years suspended. This appeal follows.

## ANALYSIS

Jefferson argues that the trial court erred in convicting him because there was insufficient evidence to prove that he abused D.L.J. He further asserts that, even if there was sufficient evidence to prove child abuse, the trial court should not have convicted him because there were insufficient time, place, and causal connections between the abuse and D.L.J.'s death to support a felony murder conviction. We disagree and affirm the trial court's judgment.

"On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). In such cases, "[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). Evidence is not insufficient merely because there is no eyewitness to the crime. *See Christian v. Commonwealth*, 221 Va. 1078, 1082 (1981) ("Typically, child abuse is practiced by a parent in the privacy of the home with no one present but the victim[.]"). Indeed, "it is axiomatic that any fact that can be proved by direct evidence may be proved by circumstantial evidence." *Haskins v. Commonwealth*, 44 Va. App. 1, 6 (2004) (quoting *Etherton v. Doe*, 268 Va. 209, 212-13 (2004)). "[W]hile no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances . . . may lead a reasonable mind irresistibly to a conclusion." *Williams v. Commonwealth*, 71 Va. App. 462, 484-85 (2020) (alterations in original) (quoting *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017)). "The judgment of a trial court, sitting without a jury, is afforded 'the same weight as a jury verdict.'" *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018) (quoting *Cole v. Commonwealth*, 294 Va. 342, 361 (2017)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

A parent "who by willful act or willful omission or refusal to provide any necessary care for the child's health causes or permits serious injury to the life or health of such child is guilty of a Class 4 felony." Code § 18.2-371.1(A). "To be willful, conduct 'must be knowing or intentional, rather than accidental, and be done without justifiable excuse, without ground for believing the conduct is lawful, or with a bad purpose.'" *Jones v. Commonwealth*, 272 Va. 692, 699 (2006) (quoting *Commonwealth v. Duncan*, 267 Va. 377, 384 (2004)). "The terms 'bad purpose' or 'without justifiable excuse,' while facially unspecific, necessarily imply knowledge that particular conduct will likely result in injury or illegality." *Ellis v. Commonwealth*, 29 Va. App. 548, 554 (1999).

We conclude that the trial court did not err by finding that there was ample evidence that Jefferson caused D.L.J. to sustain severe injuries resulting in his death. Four expert witnesses opined that D.L.J.'s injuries could only be caused by severe blunt force trauma.

Jefferson testified that he was the only person around D.L.J. that day. *Cf. Collado v. Commonwealth*, 33 Va. App. 356, 364 (2000) ("[W]here it appears that a criminal assault was made upon a child within a particular period of time, evidence which shows that the accused was sole custodian of the child during that period may be sufficient, standing alone, to prove criminal agency." (alteration in original) (quoting *Christian*, 221 Va. at 1082)). Jefferson admitted to investigators that he shook D.L.J. that day to stop D.L.J. from crying and was concerned that he had shaken D.L.J. too hard. Jefferson's actions were willful given the high amount of force necessary to cause D.L.J.'s injuries. Additionally, Jefferson admitted that others had warned him numerous times that shaking D.L.J. could cause brain injuries. *See id.* at 366 ("The requirement that the act be 'willful' does not mean . . . that the Commonwealth was required to prove appellant intended to injure" the child but that "the Commonwealth was required to prove only that appellant knew [his] conduct would likely result in serious injury.").

The trial court, as a fact finder, was under no obligation to accept Jefferson's competing explanations for D.L.J.'s injuries. *See Edwards v. Commonwealth*, 68 Va. App. 284, 301 (2017) ("Merely because [a] defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded." (alteration in original) (quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004))). Nor did the court have to believe Jefferson's testimony at trial that he did not shake D.L.J. "violently." *See Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011) ("[T]he fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." (quoting *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998))). This evidence conflicted with the expert testimony that D.L.J.'s injuries were acute, would be immediately apparent, and would not be caused by a short fall. It was within the trial court's authority to believe the expert testimony over Jefferson's competing evidence. *See Sandoval v. Commonwealth*, 20 Va. App. 133, 138 (1995) ("The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented."). Accordingly, we affirm his convictions.

Jefferson argues that there was an insufficient "time, place, and causal connection" between his felonious act—child abuse and neglect in violation of Code § 18.2-371.1—and D.L.J.'s death, to support his felony murder conviction. We disagree.

"The killing of one accidentally, contrary to the intention of the parties, while in the prosecution of some felonious act . . . is murder of the second degree." Code § 18.2-33. "In such case, malice is imputed and raises an accidental homicide to the level of second-degree murder." *Montano v. Commonwealth*, 61 Va. App. 610, 614 (2013). "The statute 'encompasses all felonious acts' not expressly excluded and is not limited to those felonies from which death is

a foreseeable consequence." *Hylton v. Commonwealth*, 60 Va. App. 50, 52-53 (2012) (quoting *Heacock v. Commonwealth*, 228 Va. 397, 404 (1984)).

The trial court did not err in determining beyond a reasonable doubt that Jefferson committed felony homicide. The temporal connection is not severed simply because D.L.J. did not die immediately, and Jefferson has not asserted any superseding act to sever the causal connection. *Cf. Brown v. Commonwealth*, 278 Va. 523, 529 (2009) (finding that, because the defendant "put[] into operation" a high-speed chase, he was directly responsible for a victim's death occurring in a collision with a police officer's car). We affirm Jefferson's felony murder conviction.

## CONCLUSION

The evidence is sufficient to find proof of felony child abuse and neglect, in violation of Code § 18.2-371.1 and felony murder, in violation of Code § 18.2-33. Thus, we affirm the trial court's judgment.

*Affirmed.*