COURT OF APPEALS OF VIRGINIA


Present:   Judges Frank, McCullough and Senior Judge Willis
Argued by teleconference


LISA MICHELLE HYLTON
                                                           OPINION BY
v.      Record No. 0055-11-3                     JUDGE JERE M. H. WILLIS, JR.
                                                           APRIL 10, 2012
COMMONWEALTH OF VIRGINIA


                    FROM THE CIRCUIT COURT OF PULASKI COUNTY
                                Colin R. Gibb, Judge

             Wade M. McNichols for appellant.

             Erin M. Kulpa, Assistant Attorney General (Kenneth T.
             Cuccinelli, II, Attorney General, on brief), for appellee.


         In a jury trial, Lisa Michelle Hylton (appellant) was convicted of second-degree felony

murder, pursuant to Code § 18.2-33, and felonious child abuse and neglect, pursuant to Code

§ 18.2-371.1(A).  On appeal, she contends the evidence was insufficient to sustain her murder

conviction.[1]  We find the evidence sufficient and affirm the conviction.

         Code § 18.2-33 prohibits "[t]he killing of one accidentally, contrary to the intention of the

parties, while in the prosecution of some felonious act other than those specified in §§ 18.2-31

and 18.2-32 . . . ."  "[T]he commission of any felonious act (other than those expressly excepted

[in Code § 18.2-33]) during the prosecution of which a death occurs supplies the malice which

raises the incidental homicide to the level of second-degree murder."  Heacock v.

---

[1] We denied the portions of appellant's petition for appeal claiming that the evidence was insufficient to sustain her conviction of felony child abuse and neglect, in violation of Code § 18.2-371.1, and that the trial court erred in denying her motion to suppress her statement to the police.

Commonwealth, 228 Va. 397, 403, 323 S.E.2d 90, 93 (1984).  The statute "encompasses all felonious acts" not expressly excluded and is not limited to those felonies from which death is a foreseeable consequence.  Id. at 404, 323 S.E.2d at 94.

"The *res gestae* rule restricts felony-murder to homicides 'so closely related to the felony in time, place, and causal connection as to make it a part of the same criminal enterprise.'"  Cotton v. Commonwealth, 35 Va. App. 511, 515, 546 S.E.2d 241, 243-44 (2001) (quoting Haskell v. Commonwealth, 218 Va. 1033, 1043-44, 243 S.E.2d 477, 483 (1978)).  However, "a death which results not from actions of the felons nor from acts directly calculated to further the felony or necessitated by the felony, but from circumstances coincident to the felony, is not a death for which a felony-murder conviction will obtain."  King v. Commonwealth, 6 Va. App. 351, 359, 368 S.E.2d 704, 708 (1988).

Under familiar principles of appellate review, we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom.  See Haskins v. Commonwealth, 31 Va. App. 145, 149-50, 521 S.E.2d 777, 779 (1999).

> When considering on appeal the sufficiency of the evidence presented below, we "presume the judgment of the trial court to be correct" and reverse only if the trial court's decision is "plainly wrong or without evidence to support it."  Davis v. Commonwealth, 39 Va. App. 96, 99, 570 S.E.2d 875, 876-77 (2002) . . . .  Thus, we do not "substitute our judgment for that of the trier of fact."  Wactor v. Commonwealth, 38 Va. App. 375, 380, 564 S.E.2d 160, 162 (2002).  "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence,

and to draw reasonable inferences from basic facts to ultimate facts." Id.

Kelly v. Commonwealth, 41 Va. App. 250, 257-58, 584 S.E.2d 444, 447 (2003) (*en banc*).

So viewed, the evidence proved that appellant illegally and feloniously purchased and took possession of methadone, brought it into her home, poured it into a medicine cup, and left the cup unattended on the kitchen counter. Her three-year-old son Trevor, who had used the medicine cup to take cold medicine, drank the methadone. Trevor died from the overdose of methadone, which the autopsy revealed could have been lethal to an adult.

On the morning of September 29, 2009, while running some errands with her father, James Hylton (Hylton), and Trevor, appellant purchased the methadone. When they returned to appellant's house, Hylton and Trevor went inside. Appellant took the methadone into the kitchen. Suspecting that the drug dealer had given her less methadone than she had purchased, appellant removed the measuring/drinking cup from a bottle of Robitussin cough syrup that Trevor had been taking for a cold. She poured the methadone into the measuring cup, confirming her suspicion. She went to the bedroom to discuss the shortage with her boyfriend, Mark Goodman. She left Trevor's medicine cup, containing the methadone, on the kitchen counter.

Hylton testified that while appellant was in the bedroom, Trevor came into the living room holding his medicine cup. He asked whether he should take his medicine. Hylton said the liquid in the cup was "cherry looking," and he tasted it with his finger. He said Trevor could take it because it was his cough syrup. Trevor said he thought he should ask his mother. Hylton agreed.

Trevor entered the bedroom, where appellant and Goodman were discussing what to do about the methadone shortage. Appellant testified she saw nothing in Trevor's hand, and he asked her no questions.

Trevor returned to the living room. He told Hylton that his mother said it was okay for him to take the medicine. Hylton asked, "Now did Momma tell you it would be all right, buddy?" Trevor replied, "I asked her, she said it would be fine." Trevor drank the contents of the medicine cup, and put the empty cup on the kitchen counter.

A few minutes later, appellant and Goodman went to the kitchen. Appellant asked Hylton about the empty cup, and said it was "my methadone." Hylton said Trevor had drunk it and that they needed to take him to the hospital immediately. Appellant said she could not do that because she was already being investigated for child abuse and neglect. She took Trevor to the bathroom and made him vomit.

Appellant's neighbor and friend, Candice Branscome, went to appellant's home about midday, after appellant called and told her that Trevor had accidentally consumed methadone. Trevor appeared dazed and was having trouble staying awake. He was scratching at his arms, head, and back. Appellant said she had made him vomit. Branscome said appellant needed to take Trevor to the hospital. Appellant said she could not because it would "be [her] ass." At that time, a protective order was in force against appellant requiring that she use only medications that were prescribed for her and that she refrain from conduct tending to endanger her child's life, health, or normal development.

Inquiring on the internet regarding accidental methadone ingestion by children, Branscome found "information that they could give them some type of medication at the hospital to try to reverse the effects, survival rates, things that could be done." Appellant gave Trevor milk and bread, as the website suggested. Branscome also advised appellant that methadone is absorbed into the pores of the mouth very quickly, so even if vomiting was induced the drug would remain in a person's body. Branscome again suggested appellant take Trevor to the hospital, and offered to drive them there. Appellant again declined. Trevor continued to appear

drowsy and was scratching. Branscome saw Trevor vomit twice. His condition had not improved when she left the house in the early afternoon.

Hylton left appellant's home to visit his wife in the hospital, but returned at about 2:30 p.m. Trevor was sleeping. Hylton told appellant they needed to take Trevor to the emergency room. She refused. When Hylton argued with appellant about this, she said she could not go to the emergency room because they would take her children away from her. Trevor remained asleep until Hylton left at 9:00 p.m.

Appellant called Branscome at 6:00 p.m., asking whether Branscome had a tube for a nebulizer to assist Trevor's breathing. When Branscome asked about Trevor's condition, appellant said he was breathing heavily, he had gotten worse, and his chest was congested. Appellant said she thought it would help if she gave him a breathing treatment. Branscome again told appellant she should take Trevor to the hospital.

Branscome spoke to appellant by telephone around 9:30 p.m. Appellant said she was keeping a close watch on Trevor. Branscome said appellant should take the child to the hospital, and offered to transport them at any time that night.

Sergeant R.D. Rucker went to appellant's home in response to a 911 call that was made at 4:38 a.m. on September 30, 2009. When he arrived, Rucker saw Trevor on the floor. The child was motionless, and Rucker could detect no breathing or pulse. Appellant told him Trevor had taken her prescription dose of methadone. Rather than wait several minutes for an ambulance to arrive, Rucker transported Trevor to the hospital in his police cruiser. Medical personnel were unable to revive Trevor despite administering Narcan, a reversal agent for several medications and drugs. Trevor was pronounced dead at 5:38 a.m.

Detective J.W. Gregory spoke with appellant at the hospital at about 7:30 a.m. She said Trevor had accidentally ingested methadone around noon the day before. She said she had

induced vomiting, but that Trevor became lethargic, was scratching himself, and his breathing was labored. Initially, appellant was reluctant to tell Gregory where she had obtained the methadone. Finally, she admitted that she abused drugs. She said she was trying to get help for her abuse. Appellant said that after Trevor drank the methadone, she took some Klonopin pills she had gotten from a person named "Smoke" to calm her down. She said that if Smoke had had any Xanax pills, she would have taken them as well. She had what appeared to be fresh needle marks on her arms. She said she had known that her drug abuse would cause her family harm someday. In a telephone call, she admitted that she had failed Trevor and that a good mother would have taken him to the hospital.

Dr. James Kuhlman, a forensic toxicologist, testified that methadone acts as a respiration depressant. With a lethal dose, a person gradually stops breathing. Dr. Kuhlman testified that methadone has a long half-life, meaning the human body eliminates it slowly.

Appellant testified that she thought Trevor would be all right because he had vomited several times after he drank the methadone. However, during that day, even appellant's thirteen-year-old son questioned whether Trevor would recover. Appellant said that when she went to bed with Trevor at about 9:00 p.m., Goodman agreed to wake up and check on Trevor during the night. She said her next recollection was Goodman waking her and saying that Trevor was not breathing. She then called 911.

The trial court submitted the issue of felony murder to the jury on two theories: (1) that Trevor's death arose out of appellant's felonious possession of methadone, or (2) that Trevor's death arose out of appellant's felonious abuse and neglect of Trevor. The verdict of guilt did not specify which theory the jury found proven, or whether it found both proven. No issue is presented on appeal as to the form of the verdict or its acceptance by the trial court. Appellant

asserts only that the evidence is insufficient to support the finding that Trevor's death was causally connected to her commission of either felonious act.

The Virginia Supreme Court has previously held that "where . . . death results from ingestion of a controlled substance, classified in law as dangerous to human life, the homicide constitutes murder of the second degree within the intendment of Code § 18.2-33 if that substance had been distributed to the decedent in violation of the felony statutes of this Commonwealth." Heacock, 228 Va. at 405, 323 S.E.2d at 95. See also Hickman v. Commonwealth, 11 Va. App. 369, 372, 398 S.E.2d 698, 700 (1990) (the felony-murder doctrine applies when an individual "participate[s] as a principal in the first degree, jointly with [the victim], in the felonious act of knowingly and intentionally possessing [the drug] and participate[s] as a principal in the second degree in [the victim's] possessory act of ingestion of [the drug]," resulting in the victim's death).

Code § 18.2-248 makes it a felony to possess methadone, a Schedule II controlled substance, except as authorized by the Drug Control Act. See Code §§ 18.2-248 and 54.1-3448. "'Possession is by nature a continuing offense.'" Morris v. Commonwealth, 51 Va. App. 459, 467, 658 S.E.2d 708, 712 (2008) (quoting Jordan v. Virginia, 653 F.2d 870, 875 (4th Cir. 1980)).

Appellant admittedly purchased the methadone illegally and possessed it feloniously on September 29, 2009. She brought it into the home, and poured it into Trevor's medicine cup. While she left the drug unattended in the kitchen and went to the bedroom to consult with Goodman, the methadone remained in her constructive possession. See Powers v. Commonwealth, 227 Va. 474, 476, 316 S.E.2d 739, 740 (1989) (constructive possession is proven by "evidence of acts, statements, or conduct of the accused or other facts or circumstances which tend to show that the defendant was aware of both the presence and the

character of the substance and that it was subject to h[er] dominion and control"). Upon her return to the kitchen, appellant remarked that Trevor had drunk "my methadone."

Appellant argues that her possession of the methadone was complete when she acquired it and brought it home and that Trevor's death was not tied to this. This argument confuses the purchase of a drug with its possession. Although appellant's *purchase* of the drug was complete, her felonious *possession* of the methadone continued at the time Trevor drank it. Her actions preceding his ingestion of the methadone were in furtherance of her felonious acquisition and possession of it. She poured the drug into the cup to test the accuracy of her purchase. She left the cup containing the drug on the counter while she went to discuss with Goodman the circumstances of their acquisition and ongoing possession. The situation she thus created gave Trevor access to the methadone and the incentive to drink it. This led directly, if not inevitably, to his drinking the methadone and his resulting death. Furthermore, the fact that her possession was terminated when Trevor consumed the drug does not alter the conclusion that the felony murder was within the *res gestae* of the crime. Trevor's drinking of the methadone plainly was "closely related . . . in time, place, and causal connection" to appellant's possession of the drug. Cotton, 35 Va. App. at 515, 546 S.E.2d at 243. Thus, the evidence sufficiently proved beyond a reasonable doubt that Trevor's death, caused by ingestion of the methadone, was within the *res gestae* of appellant's felonious possession of the drug and that appellant was guilty of felony murder.

Appellant also contends the evidence did not prove Trevor's death was within the *res gestae* of appellant's commission of felonious child abuse and neglect. However, because we find the child's death resulted from appellant's felonious possession of methadone, we need not address this alternative argument. "[A]ny discussion on that point would conflict with two principles of judicial self-restraint: our reluctance to issue what amounts to an 'advisory

opinion' on an inessential subject, and our corresponding desire to decide the case 'on the best and narrowest ground available.'" Cooper v. Commonwealth, 54 Va. App. 558, 566, 680 S.E.2d 361, 365 (2009) (quoting Johnson v. Commonwealth, 45 Va. App. 113, 117 n.3, 609 S.E.2d 58, 60 n.3 (2005) (other citations omitted).

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.