UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Athey, Causey and Chaney
Argued at Williamsburg, Virginia


TERRANCE LAVON GATES

                                        MEMORANDUM OPINION* BY
v.        Record No. 0531-24-1           JUDGE CLIFFORD L. ATHEY, JR.
                                         OCTOBER 21, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
Marjorie A. Taylor Arrington, Judge

Taite A. Westendorf (Westendorf & Khalaf, PLLC, on briefs), for
appellant.

Justin B. Hill, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


A jury empaneled in the Circuit Court of the City of Chesapeake ("trial court") found

Terrance Lavon Gates ("Gates") guilty of child abuse or neglect in violation of Code

§ 18.2-371.1(A), child cruelty in violation of Code § 40.1-103, and felony murder in violation of

Code § 18.2-33.  The trial court sentenced Gates to a total of 55 years' incarceration, with 32 years

suspended.  On appeal, Gates contends that the trial court erred by denying his motions to strike the

charges underlying his convictions.  For the following reasons, we disagree and affirm the judgment

of the trial court.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

# I. BACKGROUND[1]

On June 1, 2021, Gates was indicted for child abuse or neglect in violation of Code § 18.2-371.1(A) and felony murder in violation of Code § 18.2-33. Over a year later, he was also indicted for aggravated malicious wounding in violation of Code § 18.2-51.2(A) and child cruelty in violation of Code § 40.1-103. He pleaded not guilty and requested a trial by jury, which began on November 13, 2023.

At trial, the evidence showed that in May or June of 2020, Gates moved into an apartment located in Chesapeake, Virginia, with his girlfriend, Sheri Morgan ("Morgan"), and her four-year-old son, S.B.[2] S.B.'s father, Sharod Boyd, Sr. ("Boyd"), shared custody of S.B. with Morgan through an informal custody arrangement. Boyd was able to see S.B. "pretty much every day" up until September of 2020. Boyd would see S.B. "when [he] got off of work," and on his days off, he "would keep him the whole day."

After Gates moved into the home, members of S.B.'s family became concerned for the child's safety and wellbeing. In late June or early July, Boyd went to Morgan's apartment to pick up S.B., and he noticed "a whop on [S.B.'s] face" for the first time. He took a photograph of S.B., which confirmed the bruising on his face. Boyd subsequently asked S.B. what had happened to him, and he responded, "They hit me. They hit me." Boyd was aware that Morgan would

---

[1] "On appeal, we recite the facts 'in the "light most favorable" to the Commonwealth, the prevailing party in the trial court.'" *Konadu v. Commonwealth*, 79 Va. App. 606, 609 n.1 (2024) (quoting *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)). "Doing so requires that we 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Id.* (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).

Additionally, parts of the record in this case are sealed. "To the extent that certain facts are found in the sealed portions of the record, we unseal those portions only as to those specific facts mentioned in this opinion. The rest remains sealed." *Khine v. Commonwealth*, 75 Va. App. 435, 442 n.1 (2022).

[2] We use initials to protect the identity of the child victim.

"punch" S.B., but it "wouldn't leave a mark." During custody exchanges, S.B. would cry and indicate to Boyd that he did not want to go back to Morgan and Gates's shared apartment.

Sharon Blanchard ("Blanchard"), S.B.'s paternal grandmother, testified that when Gates entered the picture, Morgan's "whole demeanor changed." She began "acting funny" toward S.B., "fussing" at Boyd, and overall became "meaner." S.B.'s behavior changed too. When Morgan would come to pick up S.B. from Blanchard's house, "he didn't want to go home with her"—he would act scared. She further testified that by August and September, S.B. "wasn't himself a lot." He had been "an outgoing baby" with "a lot of energy," but he "got real slow" and "just wanted to sit down." Brittany Morgan ("Brittany") also testified that prior to July, S.B. was "happy" and "healthy," but afterward her sister, Morgan, became "more aggressive" and "angry" toward S.B. After Brittany was made aware of the photo of S.B.'s bruised face, Brittany testified that she "fussed at" Morgan, who, in her opinion, was unwilling to take S.B. to the doctor due to her being "afraid of what CPS or the doctors would say to her and do."[3] Brittany also confirmed that Gates was "in the picture" during this timeframe.

Boyd also testified that in September of 2020, Morgan, accompanied by Gates, came to his house to pick up S.B. Upon their arrival, S.B. cried and attempted to evade Morgan. Ultimately, S.B. was placed in their car, and they left. Boyd subsequently filed for joint custody of S.B. and contacted Morgan, asking her who was watching S.B. Morgan advised Boyd not to "worry about it" and that Gates was babysitting S.B. Despite texting and calling Morgan repeatedly, neither Boyd nor any other relatives were able to see S.B. for approximately the next two weeks.

On the evening of October 7, 2020, Gates and Morgan transported S.B. to Chesapeake Regional Medical Center. S.B. was unresponsive upon arrival and had suffered an "extensive brain

---

[3] Morgan, alone, ultimately took S.B. to the doctor.

injury, characterized by swelling of his brain." S.B. was then transferred to Children's Hospital of the King's Daughters in Norfolk ("CHKD").

Officer Mikayla Beasley of the Chesapeake Police Department ("Officer Beasley") testified that she was dispatched to CHKD on the evening of October 7, 2020, where she saw "a child on a stretcher being wheeled in," later identified as S.B. She also observed "a knot on the forehead" from ten feet away, and when she got "up close," she also saw "bruising to the abdomen and legs."

S.B. was subsequently placed on life support following neurosurgery that left his brain exposed to relieve internal pressure due to the traumatic brain injury. Boyd described S.B. on life support as having "blue, purple, and black marks, like whops on his back, chest, and legs" and "a big knot on his forehead." Blanchard testified that it looked "like he was tortured." Within a week, on October 14, 2020, S.B. was declared brain dead and removed from life support.

Laura Dean ("Dean"), a family services specialist in the Child Protective Services Unit, testified that she came to CHKD where she interviewed Gates, who told her that he had moved in with Morgan in May of 2020. He also advised Dean that because he worked from home, when Morgan stopped allowing S.B. to visit Boyd's parents' home, he offered to watch him. According to Gates, on Monday, October 5, 2020, Morgan left without feeding S.B., and around 10:00 a.m., Gates checked with S.B. to see if he wanted anything to eat. If hungry, S.B. would normally say "eat, eat," but he did not respond. Around noon, Gates tried to feed S.B. lunch, but S.B. would not eat. Gates next claimed that when he opened the door to S.B.'s room, their dog ran through "full speed," causing S.B. to hit his head on the side of the wooden bedframe, which, according to Gates, was an everyday occurrence. Gates further advised Dean that S.B. sustained an injury to his forehead from contacting the bed frame. Gates then stated that he put some ointment that Morgan

had for swelling on S.B.'s forehead before contacting Morgan to let her know that S.B. had hit his head.

Gates then told Dean that the next day, October 6, 2020, Morgan and S.B. left at 9:00 a.m. to wash clothes and returned approximately five hours later. That evening, Gates left the home, and upon his return, he did not see S.B. Morgan did inform Gates that S.B. did not want to eat dinner that night.

On October 7, 2020, Gates stated that Morgan left for work in the morning, leaving Gates to babysit S.B., who did not eat at all that day. Gates also claimed that S.B. never complained that he did not feel well, but when Morgan arrived home that evening, S.B. was in his room lying down. According to Gates, Morgan then told S.B. to pick up his toys before she and Gates went into the bathroom to wash their dog, which had urinated on itself earlier that day.

While washing the dog, Gates stated that he heard a "weird noise," so he opened the door to check on S.B., who looked as though he was about to vomit. Gates then took S.B. into the bathroom where he vomited into the toilet. After S.B. finished vomiting, he walked back into his room to lay down. Whereupon Gates brought him back into the bathroom, where S.B. started to "drop" and became increasingly unresponsive. After Gates splashed water on S.B.'s face and S.B. did not respond, Gates and Morgan took S.B. to the hospital. Gates said he did not call 9-1-1 because he "felt like [he] could get there faster" and S.B. was really "shutting down."

When Dean asked Gates if he ever disciplined S.B., he responded that he had "popped him a few times" using only his hand. Video footage from the interview showed Gates making open-handed swatting motions in describing what he meant by "popping." He demonstrated how he would "pop" S.B. on his hand. He could not say if he had ever hit S.B. anywhere else on his body. Gates claimed he did not feel comfortable disciplining S.B. and if he ever spanked S.B. on the buttocks it could only have been once. When asked how S.B. got "the other bruising," Gates

indicated that the dog had bruised and scratched S.B. When asked about how S.B. got bruising on his stomach, Gates responded, "I don't know." He admitted that he had seen S.B.'s body while he was bathing and that he saw "little . . . dots" on S.B.'s stomach before S.B. arrived at the hospital, but he could not recall when he first saw the marks.

When asked if Morgan disciplined S.B., Gates stated that she would "pop" him and that he had seen her "pop his hand" but nowhere else. He also indicated that Morgan would discipline S.B. in his room and he would not "go in there." Gates admitted that only he and Morgan had contact with S.B. during the 48 hours preceding his admission to the hospital. Gates was unable to state how S.B. obtained the injuries that led to his hospitalization, claiming that S.B. had been "fine all day," even after Morgan arrived home. Gates denied harming S.B. or observing Morgan inflict harm on S.B.

Based on her interview with Gates, Dean testified that she became concerned because Morgan and Gates "were the only caretakers in the previous days for the child, and . . . there was no plausible explanation for how the child sustained such injuries as he did." Dean observed that "at least some" of S.B.'s injuries would have been visible despite the child wearing "normal clothes." She further noted that Gates had bathed S.B., so he would have observed the child's body.

Detective James Thomas with the Chesapeake Police Department ("Detective Thomas") testified that on October 8, 2020, he jointly interviewed Morgan and Gates at their apartment. Detective Thomas testified that he inquired of Gates how S.B. received his forehead injury, and Gates advised him that on October 5, 2020, S.B. "fell off the bed and hit his head." They also told Detective Thomas that the dog would run at S.B. and knock him over, resulting in bruises, and that the dog would "nip[]" at S.B.[4]

---

[4] During the interview, there was also a conversation regarding an incident where S.B. was running from Morgan and hit his head on "the wooden part of the couch where there wasn't a lot of padding."

Gates also told Detective Thomas that he had "spanked" or "popped" S.B. before, which Detective Thomas interpreted as "[p]opping him, like, on the butt, and like an openhanded pop." Gates further described how he had seen Morgan "spank" S.B. before. Detective Thomas further testified that "collectively," Gates and Morgan admitted to having seen injuries on S.B., with Gates explaining the injuries as having been caused by the dog running at S.B., knocking him over, and pouncing on him. Gates also acknowledged that Morgan gave him "permission" to discipline S.B. and that he had given S.B. "an open-handed strike to the hand" and had spanked S.B. on the rear end.[5]

Dr. Nicole Masian, a forensic pathologist and medical examiner who performed the autopsy on S.B., identified his cause of death as "[m]ultiple blunt force trauma." Dr. Masian also testified that S.B. had an "extreme number of injuries," uncommon in "number and severity." Regarding "blunt force trauma to the head and neck," she testified that S.B. had a "blue/purple abraded contusion on his midforehead with swelling"—"a big knot"—with "a lot of scrapes and bruises all over his head." She further testified that S.B.'s brain was "very swollen" and described the nature and extent of the injuries as "unusual in a 4-year-old." Dr. Masian also opined that S.B. had torn bridging veins, which caused an accumulation of blood that "put pressure on the brain and . . . damaged it."[6]

---

[5] During the interview, Morgan admitted that she had "pop[ped]" S.B. in the mouth on October 6, 2020, and that the bruising on S.B.'s legs and abdomen could have come from her popping him too hard. Morgan also claimed that she spanked S.B. "frequently," including "[t]hroughout the entire course of the prior weekend."

[6] Regarding "blunt force trauma to the torso and extremities," Dr. Masian noted that there were "multiple contusions, bruises, and abrasions, scrapes." Dr. Masian also found "bleeding in the mesentery," "the tissue that feeds the small bowel," bleeding in the "small bowel wall" and "perforations of the wall and the duodenum, which is the area of the small bowel[] where it connects to the stomach," "hemorrhage in the pancreas and the area around the pancreas," an "infarct of the kidney," which is "like a stroke in the brain," and "areas of hemorrhage around the spinal cord." She noted that these injuries were from "blunt-force trauma" or "acceleration and deceleration motions."

Dr. Masian further opined that she "would not expect a kid to get that number of injuries just from active play or from falling down, or falling off a bed or a couch, or even, you know, falling off of a stairway onto cement or something." Instead, she opined that "[f]alling down flights of stairs onto cement, a car accident, or being beaten" could cause the number of injuries she observed. Hence, she concluded that S.B.'s injuries were inconsistent with him falling from a bed and that it was "not possible" for S.B. to have sustained such injuries from "a single fall." She also concluded that S.B.'s injuries did not suggest infliction by an animal.

Michelle Clayton, M.D. ("Dr. Clayton"), formerly the Medical Director of the Child Abuse Program at CHKD, testified that during her evaluation of S.B.'s body, she counted 137 individual bruises, of which "the overwhelming majority" were "diagnostic of abusive injury or inflicted trauma." S.B. also "suffered massive blunt force abdominal trauma" causing the various internal injuries discovered during his autopsy. Dr. Clayton also noted that S.B. had "a large collection of blood around the right side of his brain, as well as extensive brain injury." She explained that "[i]njury to the whole brain or to large areas of the brain comes from indirect forces, not from direct impact unless that impact is severe." She further noted that "[w]hen there is injury to an extensive area of the brain," such an injury is not "caused by a single impact" unless it is "incredibly violent." Dr. Clayton explained that such an injury may be caused by "a repetitive series of blows or a prolonged kind of assault, . . . violent trauma which caused someone to impact a surface at a very high rate of speed," or from shaking. She further opined that the explanation of how S.B. sustained his injuries[7] failed to "account for why he had such severe brain injury." Dr. Clayton diagnosed S.B.'s brain injuries as "abusive head trauma."

---

[7] The only account Dr. Clayton received about the source of S.B.'s head trauma was provided by Morgan on October 8, 2020, over the phone. She explained to Dr. Clayton that the forehead bruise originated from S.B. falling in his bedroom on October 6, 2020. Morgan told her that "she had heard a noise," and when she went to look, she saw S.B. "had swelling at the center of his forehead," and he pointed at his bed when Morgan "asked him what happened."

Dr. Clayton further opined that immediately after a person suffers a violent brain injury, they will exhibit symptoms. The symptoms may be "mild at first" and include "being sleepier than usual" or vomiting. A person could have "moderately severe symptoms such as seizure activity or even difficulty breathing"—a person can even become unresponsive or comatose, or they "might even die immediately after that injury." "When you have such severe injury to the brain itself, the onset of symptoms . . . is immediate. And so anyone who's observing the child will be able to tell if the child is acting abnormally." Thus, she opined that based on S.B. acting normally on the morning of October 7, 2020, while eating his breakfast but displaying a decreased appetite, "the severe head injuries and the other body injuries that were noted had not yet occurred."[8]

Dr. Clayton further testified that "[a]nybody who was looking at him, particularly if they were helping him change his clothes or bathing him, would have noticed these injuries." She also testified that "any prudent caregiver who saw extensive injuries on their child should have sought medical care on their behalf." She concluded that the number of bruises indicated that S.B. had a "multitude of severe blows administered to him."[9] Moreover, Dr. Clayton concluded that "[S.B.] suffered a violent series of injuries" for which there was not "any plausible explanation."

At the conclusion of the Commonwealth's case-in-chief, Gates moved to strike the charges against him. In relevant part, he argued that the evidence was insufficient to prove the child abuse or neglect and child cruelty charges, because he was "clueless" as to the severity of what Morgan

---

[8] On cross-examination, Dr. Clayton indicated that presuming the information she had been given was correct, the injury that led to S.B.'s collapse was sustained after Morgan returned home on October 7, 2020. She also stated that the swelling on S.B.'s forehead was "separate and apart from the internal brain injuries," assuming that she "had truthful information about how the child was behaving after that injury was noticed."

[9] Dr. Clayton also noted that some of the bruises were in "linear" or "curvilinear arrays," which is indicative of having been "caused by a punch or some other blow in which multiple injuries were inflicted at once." As many as 40 of S.B.'s bruises may have been caused by approximately 13 blows. But the other almost 100 bruises were caused by separate impacts.

was doing to S.B., and the evidence showed that he acted "with due diligence once he knew [S.B.] was in trouble." Regarding his felony-murder charge, Gates contended that for the charges of child abuse or neglect and child cruelty to serve as predicate felonies, the Commonwealth was required to—but failed to—show that Gates neglected S.B. and "that as part of one continuous transaction closely related in time and place, [S.B.] died." The trial court denied Gates's motions on each of the charges. After calling Dean as his own witness, Gates rested and renewed his motions to strike, incorporating all his previous arguments. The trial court denied his renewed motions.

The jury was instructed, and after closing arguments, began its deliberations. The jury subsequently returned its verdicts acquitting Gates of aggravated malicious wounding but finding him guilty of child abuse or neglect, child cruelty, and felony murder. On December 15, 2023, Gates filed a motion to set aside the verdict, arguing that the Commonwealth's evidence failed to satisfy the "causal connection" requirement of the res gestae rule and that the evidence was insufficient to show that either underlying felony was committed with malice. After hearing argument on the motion, the trial court denied the motion and sentenced Gates to 10 years' incarceration with 8 years suspended on the child abuse or neglect conviction, 5 years' incarceration with 4 years suspended on the child cruelty conviction, and 40 years' incarceration with 20 years suspended on the felony-murder conviction, for a total of 23 years' active incarceration. Gates appealed.

II. ANALYSIS

A. *Standard of Review*

"When faced with a challenge to the sufficiency of the evidence, we 'presume the judgment of the trial court to be correct' and reverse only if the trial court's decision is 'plainly wrong or without evidence' to support it." *Crowder v. Commonwealth*, 41 Va. App. 658, 662 (2003) (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 257 (2003) (en banc)). We must ask "whether, after

- 10 -

viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Kelly*, 41 Va. App. at 257 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "If there is evidence to support the conviction, an appellate court is not permitted to substitute its own judgment for that of the finder of fact, even if the appellate court might have reached a different conclusion." *Conrad v. Commonwealth*, 31 Va. App. 113, 123 (1999) (en banc) (quoting *Presley v. Commonwealth*, 256 Va. 465, 466 (1998)). Thus, when a criminal conviction results from a jury trial, "we review the jury's decision to see if reasonable jurors could have made the choices that the jury did make," and "[w]e let the decision stand unless we conclude no rational juror could have reached that decision." *Pease v. Commonwealth*, 39 Va. App. 342, 355 (2002) (en banc).

B. *The trial court did not err in denying Gates's motion to strike the charge of child abuse or neglect.*

Gates argues that the evidence was insufficient to establish that he possessed the required intent under Code § 18.2-371.1(A). He contends that the evidence at trial "failed to prove that [he] was aware of a serious danger to S.B. and recklessly disregarded it." Further, he asserts that "Code § 18.2-371.1(A) does not impose criminal liability on custodians for failing to preemptively identify every potential hazard; instead, it penalizes willful omissions, requiring an awareness of the danger to the child's life." Accordingly, he maintains that the evidence "failed to establish that Gates was aware of a serious risk until [S.B.] collapsed on October 7." We disagree.

Under Code § 18.2-371.1(A),

> Any parent, guardian, or other person responsible for the care of a child under the age of 18 who by willful act or willful omission or refusal to provide any necessary care for the child's health causes or permits serious injury to the life or health of such child is guilty of a Class 4 felony.

"The word [willful] often denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental. But when used in a criminal statute it generally means an act done

- 11 -

with a bad purpose; without justifiable excuse; stubbornly, obstinately, perversely[.]" *Barrett v. Commonwealth*, 268 Va. 170, 183 (2004) (alterations in original) (quoting *United States v. Murdock*, 290 U.S. 389, 394 (1933)). "The term 'willful act' imports knowledge and consciousness that injury will result from the act done. The act done must be intended or it must involve a reckless disregard for the rights of another and will probably result in an injury." *Id.* "In other words, 'the defendant must have been aware that [the] conduct was likely to result in serious injury.'" *Flowers v. Commonwealth*, 49 Va. App. 241, 248 (2007) (alteration in original) (quoting *Mangano v. Commonwealth*, 44 Va. App. 210, 214 (2004)). "[S]omething more than negligence must be proved beyond a reasonable doubt to support [a] conviction [under Code § 18.2-371.1(A)]." *White v. Commonwealth*, 68 Va. App. 111, 119-20 (2017) (alterations in original) (quoting *Ellis v. Commonwealth*, 29 Va. App. 548, 555 (1999)). Code § 18.2-371.1(A) "proscribes advertence, not inadvertence." *Mangano*, 44 Va. App. at 216. "Intent may, and most often must, be proven by circumstantial evidence and the reasonable inferences to be drawn from facts that are within the province of the trier of fact." *Snow v. Commonwealth*, 33 Va. App. 766, 775 (2000) (quoting *Ellis*, 29 Va. App. at 555).

"Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Clark v. Commonwealth*, 78 Va. App. 726, 751-52 (2023) (quoting *Holloway v. Commonwealth*, 57 Va. App. 658, 665 (2011) (en banc)). "[W]hether an alternate hypothesis of innocence is reasonable is a question of fact and, therefore, is binding on [this Court] unless plainly wrong." *Id.* at 752 (alterations in original) (quoting *Maust v. Commonwealth*, 77 Va. App. 687, 700 (2023)). "[A]lthough a 'single piece of evidence may [not] be sufficient, the combined force of many concurrent and related circumstances . . . may lead a reasonable mind irresistibly to a

- 12 -

conclusion.'" *Commonwealth v. Garrick*, 303 Va. 176, 184 (2024) (second and third alterations in original) (quoting *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017)).

Here, we find the evidence sufficient to establish that Gates was aware that his conduct was likely to result in serious injury to S.B. On October 7, 2020, Gates was S.B.'s sole caretaker for the entire day before Morgan returned home from work. On that day, S.B. had no appetite, and by the end of the day, S.B. became unresponsive, requiring intensive care at a local hospital. At the hospital, medical staff identified severe head injuries, internal injuries, and at least 137 individual bruises to S.B.'s body. Gates, by his own admission, had at least seen the large area of bruising and swelling on S.B.'s head and the bruising on S.B.'s abdomen, demonstrating an awareness of S.B.'s injuries. *See Mangano*, 44 Va. App. at 216. Yet Gates sought no medical care for these injuries until S.B. exhibited severe symptoms, and as Dr. Clayton opined, "any prudent caregiver who saw extensive injuries on their child should have sought medical care on their behalf." Thus, considering the quantity and severity of the injuries S.B. sustained prior to his admission to the hospital, Gates's awareness of those injuries and subsequent lack of action was sufficient to prove that his omission was willful. *See Barrett*, 268 Va. at 183.[10]

C. *The trial court did not err in denying Gates's motion to strike the charge of child cruelty.*

Gates contends that the evidence was insufficient to establish that he was criminally negligent, as required by Code § 40.1-103. He acknowledges that "the analysis is substantially the

---

[10] What is more, a rational juror could have concluded that the circumstantial evidence in this case established that Gates willfully inflicted serious injuries upon S.B. Although the evidence showed that Morgan may have caused some of S.B.'s injuries, Gates admitted that he would sometimes "pop" S.B. Additionally, an inference arising from the sheer numerosity of bruises is that S.B.'s injuries were inflicted by more than one person, and Gates and Morgan were S.B.'s only caretakers for the two weeks preceding his hospital admission. Moreover, the jury also heard about the July 2020 incident and how S.B. explained to Boyd, "*They* hit me. *They* hit me," implicating both Morgan *and* Gates as having hit S.B. in the past. (Emphases added). Hence, the circumstantial evidence in this case was of such a nature that it "may lead a reasonable mind irresistibly to [the] conclusion" that Gates caused S.B. to suffer serious injuries and that he did so willfully. *Garrick*, 303 Va. at 184 (quoting *Moseley*, 293 Va. at 463).

same as for" his assignment of error regarding his conviction for child abuse or neglect, and he argues that "the evidence failed to establish that Gates had knowledge of injuries to [S.B.] requiring immediate medical attention prior to . . . Morgan inflicting grievous injuries to him on October 7, 2020." We disagree.

Under Code § 40.1-103(A),

> It shall be unlawful for any person employing or having the custody of any child willfully or negligently to cause or permit the life of such child to be endangered or the health of such child to be injured, or willfully or negligently to cause or permit such child to be placed in a situation that its life, health or morals may be endangered, or to cause or permit such child to be overworked, tortured, tormented, mutilated, beaten or cruelly treated.

"Code § 40.1-103, being a criminal statute, requires proof of a greater degree of negligence than is required in a civil action." *Mosby v. Commonwealth*, 23 Va. App. 53, 59 (1996). The statute requires proof of "a recklessness or indifference incompatible with a proper regard for human life." *Id.* (quoting *Bell v. Commonwealth*, 170 Va. 597, 611 (1938)). "The negligence must be 'so gross and culpable as to indicate a callous disregard of human life and the probable consequences of his act.'" *Id.* (quoting *Keech v. Commonwealth*, 9 Va. App. 272, 277 (1989)).

Here, the evidence reflected that Gates was aware of various serious injuries to S.B. and failed to seek medical attention for those injuries. The large area of swelling and bruising on S.B.'s forehead was present during the day of October 7, 2020, while Gates was S.B.'s sole caretaker. That particular injury, by the time of S.B.'s admission to the hospital, was visible from ten feet away. Additionally, Gates, by his own admission, had noticed bruising on S.B.'s stomach, but he could not say when he first became aware of the bruises. S.B.'s extensive injuries that made him look "like he was tortured" were depicted in photographs introduced at trial. A rational juror could have inferred from the photographic evidence how S.B.'s body would have appeared on October 7, 2020, while Gates was babysitting him. And as Dr. Clayton opined, any prudent

caregiver who became aware of those "extensive" injuries should have sought medical care on behalf of S.B. Gates was aware of the serious injuries and failed to seek treatment for S.B.'s injuries until it was too late. Hence, we cannot say that "no rational juror," *Pease*, 39 Va. App. at 355, could have found that Gates's negligent failure to seek medical care for S.B.'s injuries was "so gross and culpable as to indicate a callous disregard of human life and the probable consequences of his act," *Mosby*, 23 Va. App. at 59 (quoting *Keech*, 9 Va. App. at 277).[11]

Since we find that there was sufficient evidence from which "reasonable jurors could have made the choices that the jury did make," *Pease*, 39 Va. App. at 355, we find no error in the trial court's denial of Gates's motion to strike the felony child cruelty indictment.

D. *Neither did the trial court err in denying Gates's motion to strike the felony-murder charge.*

Gates also assigns error to the trial court's denial of his motion to strike the felony-murder charge. He first contends that the evidence was insufficient to prove that he possessed the requisite malice necessary to support a felony-murder conviction. He also asserts that the evidence failed to establish that "the homicide occurred within the res gestae of the underlying felonies" because no causal connection exists between the underlying felonies and S.B.'s death. We disagree.

---

[11] Other avenues of criminal liability under Code § 40.1-103 also support Gates's conviction, chiefly that Gates displayed "a callous disregard of human life and the probable consequences of his act[s]," *Mosby*, 23 Va. App. at 59 (quoting *Keech*, 9 Va. App. at 277), and inflicted life-threatening injuries or permitted such life-threatening injuries to occur in his presence. S.B. suffered from multiple traumatic injuries that were indicative of abuse. Gates admitted to popping S.B., and as stated above, from the numerosity of bruises, a rational juror could have inferred that his injuries were inflicted by multiple people, Gates included. S.B. was found to be suffering from not only external injuries but internal injuries as well, and his bruises were arrayed in formations indicative of blows inflicted by punches. Moreover, a rational juror could have inferred that Gates was aware of any serious injuries inflicted by Morgan, yet permitted the abuse to continue.

- 15 -

1. <u>Gates failed to preserve his contention that the evidence was insufficient to establish malice.</u>

Gates asserts that because the jury acquitted him of aggravated malicious wounding, the jury necessarily found that he did not act with malice. He also contends that because Morgan "inflicted the fatal injuries," the jury "cannot legally attribute malice to him for felony murder." However, Gates failed to preserve for appellate review either of these objections made for the first time during his post-trial motion to set aside the verdict.

Pursuant to Rule 5A:18, "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." "The goal of the contemporaneous objection rule is to avoid unnecessary appeals, reversals and mistrials by allowing the trial judge to intelligently consider an issue and, if necessary, to take corrective action." *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011) (quoting *Campbell v. Commonwealth*, 12 Va. App. 476, 480 (1991) (en banc)).

Here, Gates simply assigned error to the trial court's denial of his motion to strike the charge of felony murder made at the conclusion of all the evidence. *See* Rule 5A:20(c)(1). During argument on his motion to strike, Gates failed to assert as a ground that he did not act with malice. *See Dickerson*, 58 Va. App. at 356. He only raised that argument during his post-trial motion to set aside the verdict. Thus, Gates failed to preserve this specific argument based on his limited assignment of error, because "we do not consider issues touched upon by the appellant's argument but not encompassed by his assignment of error." *Banks v. Commonwealth*, 67 Va. App. 273, 290 (2017). While an appellant may preserve a challenge to the sufficiency of the evidence by making a motion to set aside the verdict, *Commonwealth v. Bass*, 292 Va. 19, 33 (2016), an appellant must *assign error* to the trial court's ruling on the motion to set aside the verdict to preserve the arguments raised for the first time in the motion to set aside the verdict. *See Molchon v. Tyler*, 262

- 16 -

Va. 175, 183 n.2 (2001) (holding that arguments raised in a motion to set aside the verdict for the first time are waived where "the argument was not the basis of 'the objection . . . stated with reasonable certainty at the time of the ruling' to which the assignment of error relates" (quoting Rule 5:25)).  Because Gates's specific contention that he lacked the requisite malice was made for the first time during his post-trial motion to set aside the verdict and he has not assigned error to the trial court's denial of his motion to set aside the verdict, the argument is waived.[12]  *See id.*; Rule 5A:18; Rule 5A:20(c)(1).

### 2. The evidence before the jury was sufficient to establish the res gestae requirement for his conviction for felony murder.

On appeal, the Commonwealth asserts that the evidence was sufficient to show that Gates inflicted the fatal blow to S.B., while Gates vehemently denies that the evidence establishes such a causal connection.  Instead, Gates contends that the evidence, even viewed in the light most favorable to the Commonwealth, establishes that Morgan "inflicted the fatal injuries" when she arrived home on the evening of October 7, 2020.  Hence, Gates argues that the evidence "failed to establish the necessary causal connection" between his underlying felonies and the death of S.B. We disagree.

Pursuant to Code § 18.2-33, "[t]he killing of one accidentally, contrary to the intention of the parties, while in the prosecution of some felonious act other than those specified in [Code] §§ 18.2-31 and 18.2-32, is murder of the second degree."  "This statute and its companion, [Code] § 18.2-32, defining first degree felony-murder, codify the common law doctrine of felony-murder." *King v. Commonwealth*, 6 Va. App. 351, 354 (1988).  "[T]he res gestae rule requires that there be a connection between the predicate felony and the death, giving effect to the statutory requirement

---

[12] Gates also argues that because the jury found him not guilty of aggravated malicious wounding, "the only logical conclusion" is that Morgan inflicted the fatal injury to S.B. However, Gates raised this argument for the first time in his motion to set aside the verdict, so in accordance with the foregoing discussion, we also find this argument waived on appeal.

that the death occur 'while in the prosecution of' the underlying felony." *Flanders v. Commonwealth*, 298 Va. 345, 359 (2021). "The rule provides that 'the felony-murder statute applies where the killing is so closely related to the felony in time, place, and causal connection as to make it a part of the same criminal enterprise.'" *Commonwealth v. Montague*, 260 Va. 697, 701 (2000) (quoting *Haskell v. Commonwealth*, 218 Va. 1033, 1044 (1978)). "[T]ime, place, and causal connection are stated in the conjunctive. Therefore, all three elements must be established for the felony-murder statute to apply." *Id.* at 702. Whether a killing occurs within the res gestae of a felony is a "fact-intensive" inquiry. *Flanders*, 298 Va. at 354. "A finder of fact must look to the particular aspects of each felony-homicide case to determine whether the death occurred within the res gestae of the underlying felony without relying on rigid formulas." *Id.*

"One of the most significant factors in defining the scope of the felony-murder doctrine involves the causation required between the felony and the death." *King*, 6 Va. App. at 355. To satisfy the causal connection requirement, "the felony or acts in furtherance thereof must contribute to cause the death." *Id.* at 357. In other words, causal connection may be established when death "result[s] from a particular act which was an integral part of the felony or an act in direct furtherance of the felony." *Id.* at 358; *see also Griffin v. Commonwealth*, 33 Va. App. 413, 425 (2000) ("The phrase 'in the prosecution' requires proof that the killing resulted from an act which was an integral part of the felony or an act in direct furtherance of or necessitated by the felony."). "[A] death which results not from actions of the felons nor from acts directly calculated to further the felony or necessitated by the felony, but from circumstances coincident to the felony, is not a death for which a felony-murder conviction will obtain." *King*, 6 Va. App. at 359. "[C]riminal liability for felony-murder requires more than a finding that 'but for' the felony the parties would not have been present at the time and location of the accidental death." *Id.*

For instance, in *Hylton v. Commonwealth*, 60 Va. App. 50 (2012), "appellant illegally and feloniously purchased and took possession of methadone, brought it into her home, poured it into a medicine cup, and left the cup unattended on the kitchen counter." *Id.* at 54. Her three-year-old son, who had been using the medicine cup to take cough syrup for a cold, drank the methadone and ultimately died the next morning. *Id.* at 54-56. On appeal from her conviction for felony murder, appellant argued that her child's death was not causally connected to her felonious possession of methadone because "her possession of the methadone was complete when she acquired it and brought it home." *Id.* at 57-58. This Court affirmed her conviction, reasoning that she had constructive possession of the methadone that continued until her son consumed it. *Id.* at 58-59. Even though her possession terminated upon the drug's consumption, we found that she created a situation where her son had "access to the methadone and the incentive to drink it," which "led directly, if not inevitably, to his drinking the methadone and his resulting death." *Id.* at 59. Hence, we concluded that her son's death "was within the *res gestae* of [her] felonious possession of the drug." *Id.*

And in *Montano v. Commonwealth*, 61 Va. App. 610 (2013), we found the element of causation to be present where the appellant was driving while intoxicated and struck another vehicle, killing a woman. *Id.* at 613, 616-17. We reasoned that expert testimony established "that the car accident which killed the victim occurred because appellant was highly intoxicated while driving." *Id.* at 616-17. Moreover, "nothing in the record suggest[ed] that the accident likely would have occurred had appellant not been under the influence of alcohol." *Id.* at 617. Hence, we concluded that "[a]ppellant's intoxicated operation of his vehicle was, thus, inextricably linked and integral to the victim's death," thus satisfying the causal connection element of res gestae. *Id.*

Here, the record reflects that Gates engaged in a course of abusive or neglectful conduct sufficient to establish that he was guilty of the offense of felony child abuse or neglect and that his

acts and omissions committed in direct furtherance of that felony contributed to S.B.'s death. *See King*, 6 Va. App. at 357. For example, reports of abuse and neglect began only after Gates moved into the apartment with Morgan and S.B. Both Morgan and S.B. also exhibited behavioral changes after Gates moved into the apartment consistent with abuse and neglect. Shortly thereafter, when asked about the cause of his facial bruising in July of 2020, S.B. told his father, "[t]hey hit me." In addition, Gates and Morgan became the sole caretakers of S.B. against Boyd's wishes two weeks prior to S.B.'s fatal injury. Even by Gates's own admission, he and Morgan were the only two people to have contact with S.B. for the 48 hours just prior to his admission to the hospital. In fact, Gates was S.B.'s babysitter for almost the entire day leading up to S.B.'s hospitalization.

In addition, prior to S.B.'s admission to the hospital, both expert testimony and numerous photographs established that S.B. acquired 137 individual bruises all over his body, including a large knot on his forehead, and that he suffered from inflicted trauma resulting in a fatal brain injury and various internal injuries. Based on the testimony of Dr. Clayton and the photographs admitted into evidence depicting the quantity and severity of S.B.'s injuries, the jury could have concluded that S.B. was subjected to numerous severe beatings over the weeks prior to his death. The record further reflects that Gates and Morgan both admitted that they would "pop" S.B. Thus, a reasonable juror could have inferred that some quantum of S.B.'s injuries were inflicted by Gates. Although Gates maintains that he acted "quickly and decisively to seek medical treatment once life threatening injuries were apparent," a rational juror could have concluded that his actions and omissions *leading up to* the infliction of the fatal injury established the causal connection between his felony offense and S.B.'s death. *Cf. Hylton*, 60 Va. App. at 59.

Moreover, uncontradicted expert testimony established that S.B.'s death was caused by "[m]ultiple blunt force trauma," which would have occurred when both Gates and Morgan were his caregivers. The quantity and severity of S.B.'s injuries—combined with no plausible explanation

for his fatal injury—could "lead a reasonable mind irresistibly to [the] conclusion" that Gates, S.B.'s caretaker, was aware that S.B. had received severe abusive injuries either by his hand or Morgan's, yet Gates failed to intervene or seek care for S.B. until it was too late. *Garrick*, 303 Va. at 184 (quoting *Moseley*, 293 Va. at 463). That same reasonable juror could also have concluded that Gates had inflicted the fatal blow himself.[13] Therefore, the record is sufficient to establish the requisite causal connection between Gates's commission of felony child abuse or neglect and S.B.'s death thereby satisfying the res gestae requirement to the extent challenged by Gates on appeal. Gates's willful actions or omissions were an integral component of his underlying offense, *see King*, 6 Va. App. at 358, and as such, the commission of the underlying offense was "inextricably linked" to S.B.'s ultimate death, *Montano*, 61 Va. App. at 617. Hence, we cannot say that no rational juror could have found that Gates's willful act or omission directly contributed to S.B.'s death. *Pease*, 39 Va. App. at 355.[14]

---

[13] We acknowledge Gates's argument that Morgan, alone, inflicted S.B.'s fatal injuries when she arrived home on the evening of October 7, 2020. This assertion apparently relies on Dr. Clayton's testimony that S.B. would have exhibited severe symptoms such as seizures and vomiting "immediately" after his fatal injury was sustained and her testimony that presuming the information she had been given was correct, the injury that led to S.B.'s collapse was sustained after Morgan returned home on October 7, 2020. Whether an alternative hypothesis of innocence is reasonable is a question of fact for the jury, and the jury's determination "is binding on [this Court] unless plainly wrong." *Clark*, 78 Va. App. at 752 (alteration in original) (quoting *Maust*, 77 Va. App. at 700). Here, the jury was permitted to reject Gates's hypothesis and infer that Gates contributed to the infliction of S.B.'s fatal injury. The jury, as finder of fact, was entitled to disbelieve Gates's statement that S.B. had been "fine all day," even after Morgan arrived home. *See Rollston v. Commonwealth*, 11 Va. App. 535, 547 (1991) ("[A] jury is not required to accept *in toto* an accused's statement, but may rely on it in whole, in part, or reject it completely."). Left with no plausible explanation for how the fatal injury occurred, we cannot say that the jury was plainly wrong to reject Gates's hypothesis.

[14] Since we have determined that S.B.'s death was within the res gestae of Gates's commission of the underlying offense of child abuse or neglect, we need not determine whether S.B.'s death was also within the res gestae of his commission of the offense of child cruelty. *See Hylton*, 60 Va. App. at 59; *Butcher v. Commonwealth*, 298 Va. 392, 396 (2020) ("[T]he doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" (quoting *Commonwealth v. White*, 293 Va. 411, 419 (2017))).

### III. CONCLUSION

For the foregoing reasons, we affirm Gates's convictions for child abuse or neglect in violation of Code § 18.2-371.1(A), child cruelty in violation of Code § 40.1-103, and felony murder in violation of Code § 18.2-33.

*Affirmed.*